IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 96-50958

---

UNITED STATES OF AMERICA

Plaintiff-Appellee,

versus

TAMMY DENISE MORROW; LARRY WAYNE MEINZER;
ALICE MARIE BARBER, also known as Alice
Marie Turner, also known as  Alice Marie
Rogers; SAMANTHA GRAHAM DAVIS, also known
as Sammie Davis, also known as Samantha
L. Davis, also known as Sammie L. Davis;
ARNOLD GENE TROUT, also known as Gene
Trout; MASON LONG; DARRELL PAUL FREEMAN,
also known as Paul Freeman; JAMES MICHAEL
CALDWELL, also known as Mike Caldwell;
PATRICK GENE MALMSTROM, also known as Rick
Malmstrom; BILLY WAYNE COX, JR., also known
as Billy Cox; MAX WAYLAN CAIN, SR.

Defendants-Appellants

---

Appeals from the United States District Court
for the Western District of Texas

---

May 25, 1999

Before HIGGINBOTHAM, JONES, and WEINER, Circuit Judges.

PER CURIAM:

Eleven defendants appeal convictions of conspiring and aiding

and abetting bank fraud in the financing of A-1 mobile homes.  The

central purpose of the scheme was to obtain bank financing for customers who had not made adequate cost down payments. We affirm all the judgments of conviction but vacate the sentence of eight defendants and remand for resentencing.

I

Count 1 of the indictment charged that from about November 3, 1986 until about February 1, 1990 the defendants conspired to commit bank fraud in violation of 18 U.S.C. §§ 371 and 1344(2). The indictment listed 43 overt acts relating to various mobile home sales transactions by the defendants. These overt acts were also alleged under Counts 2 through 13 in the indictment as substantive counts of bank fraud against each of the defendants. Count 14 alleged that Mason Long committed bank fraud in an effort to obtain financing for the purchase of mobile homes, in violation of 18 U.S.C. §§ 371 and 1344(2). Count 15 alleged that Mason Long, Billy Cox, and Max Cain participated in the financing bank fraud scheme in violation of 18 U.S.C. §§ 371 and 1344(2). Count 16 alleged that Billy Cox and Max Cain defrauded a bank of $15,000 to start a company called "Slow and Easy," in violation of 18 U.S.C. §§ 371 and 1344(1).

The defendants were tried together and all were convicted of one or more counts. We summarize the convictions:

**Alice Barber**, an A-1 sales representative and manager in Bryan, Texas, was convicted of conspiracy to commit bank fraud (Count 1) and aiding and abetting bank fraud (Count 4).

2

**Max Cain**, the vice-president of Home Savings, Banc Home, and HSA Mortgage Company, was convicted of bank fraud (Count 1) and two counts of bank fraud and aiding and abetting bank fraud (Counts 2 and 15).

**James Caldwell**, an A-1 sales representative in Nacogdoches, Texas, was convicted of conspiracy to commit bank fraud (Count 1) and aiding and abetting bank fraud (Count 10).

**Billy Cox**, owner of A-1 mobile home franchises, was convicted of bank fraud (Count 1) and two counts of bank fraud and aiding and abetting bank fraud (Counts 3 and 15).

**Sammy Davis**, an A-1 sales representative in Bryan, Texas, was convicted of aiding and abetting bank fraud (Count 7).

**David Freeman**, an A-1 sales representative in Bryan, Texas, was convicted of conspiracy to commit bank fraud (Count 1) and aiding and abetting bank fraud (Count 8).

**Mason Long**, partner to Billy Cox, was convicted of bank fraud (Count 1) and two counts of bank fraud and aiding and abetting bank fraud (Counts 14 and 15).

**Pat Malmstrom**, an A-1 sales representative in Waco, Texas, was convicted of conspiracy to commit bank fraud (Count 1) and aiding and abetting bank fraud (Count 12).

**Tammy Morrow**, an A-1 sales representative in Nacogdoches, Texas, was convicted of aiding and abetting bank fraud (Count 11).

**Larry Meinzer**, an A-1 sales representative in Waco, Texas, was convicted of aiding and abetting bank fraud (Count 13).

**Gene Trout**, an A-1 sales representative in Bryan, Texas, was convicted of conspiracy to commit bank fraud (Count 1) and aiding and abetting bank fraud (Count 9).


II

Bank fraud under 18 U.S.C. § 1344 requires proof beyond a reasonable doubt that the defendants knowingly executed or attempted to execute "a scheme or artifice – (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds,

3

credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations or promises." To establish a conspiracy violation under 18 U.S.C. § 371, the Government had to prove beyond a reasonable doubt: "(1) an agreement between two or more people, (2) to commit a crime against the United States, and (3) an overt act by one of the conspirators to further the objectives of the conspiracy." United States v. Dupre, 117 F.3d 810, 820 (5th Cir. 1997) (holding evidence of cooperative effort sufficient to support convictions for conspiracy to commit bank fraud), cert. denied, --- U.S.---, 118 S. Ct. 857 (1998). A defendant may be convicted for aiding and abetting the commission of a crime if he was "'associated with a criminal venture, participated in the venture, and sought by his action to make the venture succeed.'" United States v. Parekh, 926 F.2d 402, 406 (5th Cir. 1991) (quoting United States v. Holcomb, 797 F.2d 1320, 1328 (5th Cir. 1986)).

III

The Government urges that it proved that Cox, Long, and Cain directed a "far reaching scheme to fraudulently obtain the funds of the Bank." Billy Cox directed the activities at the various A-1 lots, and Max Cain worked to keep the fraudulent loan practices hidden. Mason Long delivered the mobile homes and instructed customers not to tell the bank that their reported down payments had been inflated. The other defendants, managers and sales

4

representatives from different lots, collected information from customers with the knowledge that the information would be used to prepare fraudulent loan packages for the sale of mobile homes.

Defendants Max Cain, James Caldwell, Samantha Davis, David Freeman, Mason Long, Pat Malmstrom, Tammy Morrow, Larry Meinzer, and Gene Trout argue insufficiency of the evidence. We apply the familiar standard, asking whether a "reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt." United States v. Mergerson, 4 F.3d 337, 341 (5th Cir. 1993).

1

Max Cain argues that there is insufficient evidence to support his conviction of Count 2; that while he may have violated 18 U.S.C. § 656 (theft, embezzlement, or misapplication by a bank officer) by selling mobile homes out of trust (pocketing the loan repayment), there was no evidence that he defrauded the bank or misrepresented any facts to it. Cain also argues that the evidence was insufficient to support his conviction to aid and abet bank fraud in Counts 2 and 15 because the Government did not prove that he shared any criminal intent with Richard White or Billy Cox, purchasers of trailers.

The Government produced evidence showing that Cain actively and knowingly participated in the scheme to defraud the bank by hiding A-1's fraudulent practices. It urges that Max Cain instructed Richard White to falsely complete various financing forms used in sales of mobile homes. The evidence also showed that

5

Cox, Cain, and Long worked together to obtain money to purchase a set of mobile homes under a floor plan. The request for funds exceeded the actual cost of the homes. The three split the excess money. Viewing this evidence in the light most favorable to the Government, a rational jury could conclude beyond a reasonable doubt that Max Cain conspired and aided and abetted the commission of such fraud.

James Caldwell was a sales representative in Nacogdoches from February 4, 1988 until September 1, 1988. He argues that the evidence against him was insufficient to support his convictions; that the Government failed to prove a single conspiracy as alleged in the indictment, or that he joined any conspiracy.

The Government presented evidence showing that Caldwell participated in the preparation of false down payments and credit applications. For instance, Tim Howard, the sales manager at the lot at which Caldwell worked, testified that Caldwell reported document falsification to him pertaining to sales Caldwell made because Howard would handle any calls from the bank regarding the applications. Janna Kimbrough also testified that Caldwell participated in the scheme to defraud the bank. Viewing this evidence in the light most favorable to the Government, a rational jury could conclude beyond a reasonable doubt that James Caldwell conspired and aided and abetted the commission of fraud.

Billy Cox contends that the evidence was insufficient to prove a violation of 18 U.S.C. § 1344(2) in Count 15 pertaining to 16

6

mobile homes purchased from the Stark Brothers under a bank floor plan, a plan for financing of mobile homes. Cox argues that this court has held that § 1334(2) requires "a material misrepresentation to the bank." United States v. Campbell, 64 F.3d 967, 975 (5th Cir. 1995). He asserts there were no misrepresentations. He admits funds may have been misapplied contrary to 18 U.S.C. § 656, or that there was evidence of a scheme to defraud a financial institution, prohibited by § 1334(1).

The Government accepts Cox's legal reasoning regarding any variance between the indictment and the proof at trial. The indictment alleges that Cox, Cain, and Long lied about the actual cost of the floor plan in order to split the excess loan proceeds. The Government's evidence, however, did not demonstrate that these defendants lied about the cost of the 16 mobile homes purchased from Stark Brothers. It does show that the bank loaned $122,899, which was 60% of the wholesale value, otherwise known as N.A.D.A. cost of the homes, and not $93,176, the dealer cost amount. Bank policy required loans be made at the lower of these two amounts.

Specifically, Kenneth Starks of Starks Brothers testified that he sold 16 mobile homes to A-1 for $93,176, the dealer cost. The testimony of Shirley Henderson also indicates that the cost of these homes was $93,176 and that 60% of the N.A.D.A. wholesale price (approx. $205,000) was $122,899. Henderson explained that it was the bank's policy in a floor plan transaction to calculate 60% of the N.A.D.A. cost and compare that to the dealer cost.

According to the bank policy, these homes should have been floor planned at $93,176, not at $122,899, the higher 60% N.A.D.A. value. Once Starks was paid the $93,176, the remaining $29,722 was sent to A-1 Mobile Homes and allegedly split between Max Cain, Billy Cox, and Mason Long.

We conclude that a reasonable member of the jury could conclude that Max Cain engaged in fraud in approving the loan at the higher N.A.D.A. amount in violation of bank policy; that he made a fraudulent representation to obtain funds from the bank. See United States v. Briggs, 965 F.2d 10, 11 (5th Cir. 1992)(holding that despite no evidence of overt misrepresentations, false promises, or false statements to a financial institution, the defendant's implicit misrepresentation that she had authority to transfer money was sufficient to establish misrepresentation element of § 1344(2)). The evidence was sufficient to support the convictions of Max Cain, Billy Cox, and Mason Long of bank fraud under § 1344(2), as alleged in Count 15 of the indictment.

Samantha Davis worked for about four weeks as an A-1 sales representative at the Bryan, Texas lot. The jury found her guilty of aiding and abetting bank fraud, Count 7 of the indictment. While she concedes that a reasonable juror could find a scheme to commit bank fraud, Davis denies that there is sufficient evidence of her knowing and intentional participation. She denies falsifying documents, urging that she was too new and in too low a

8

position in the A-1 hierarchy to direct others to falsify documents.

Tim Howard, a Government witness, testified that he discussed the short down payment scheme with Sammie Davis and that she expressed concern about "getting in trouble" after reading an article about mobile home salesmen who were arrested in Florida for making short down payments. Howard also testified that Davis had previous experience with short down payments from a former job at another mobile home company. The evidence was also that Alice Barber, the manager at the Bryan lot, instructed Davis on how to place false information in the loan documents. Viewing this evidence in the light most favorable to the Government, a rational jury could conclude beyond a reasonable doubt that Sammie Davis aided and abetted commission of such fraud.

David Freeman argues that there is insufficient evidence to support his convictions for conspiracy to commit bank fraud and aiding and abetting bank fraud because the Government witnesses called to testify against him could not identify him as the salesman involved in their falsified mobile home purchase transactions. He asserts that the Government failed to show that he caused any false documents to be submitted to the bank or that he even knew such things were happening at A-1.

The Government replies that Freeman's name was listed on the false documents as a participant. A handwriting expert testified that Freeman prepared the falsified documents in sales to A-1

9

customers Kearney, Gurka, and Nix. The evidence also showed that salesmen, including David Freeman, openly discussed the inflated down payment scheme.  This was sufficient.

Mason Long moved for a judgment of acquittal on Counts 1, 14, and 15, arguing that the evidence was insufficient to support his convictions.  He urges that no evidence linked him to the falsification of customers' loan information.  Long's job was to deliver and set up A-1 mobile homes.  He argues that the government's evidence was only that he must have known about the fraud because he was around the office; that he once told another employee, who took drugs, that customers must be reminded that if asked, they are to deny any inflated down payment.  Specifically, Long challenges his conviction on Count 14, charging falsifying information to secure a floor plan loan.  In addition, Long claims the Government provided no evidence that he knew about or participated in the Starks Brothers transactions with Cox and Cain or that he knowingly submitted any false statements.

The Government asserts that Long's overt actions showed that he knowingly participated in the scheme and that he promoted the falsification of documents to obtain loan funds.  The Government presented direct evidence that Long instructed customers not to reveal the inflated down payment information if bank investigators called them.  The Government offered financial statements prepared by Long to be submitted to the bank for the purpose of obtaining floor planning finance for A-1.  These statements contained large

discrepancies between listed assets' declared values and the actual value of the properties. The evidence also demonstrated that Long conspired with Max Cain and Billy Cox and split the proceeds of the excess loan in the Stark Brothers' mobile homes transaction. Viewing this evidence in the light most favorable to the Government, a rational jury could conclude beyond a reasonable doubt that Mason Long conspired and aided and abetted the commission of such fraud.

Pat Malmstrom argues the evidence was insufficient to support his convictions for conspiracy to commit bank fraud and aiding and abetting bank fraud. He argues that the Government attempted to make his conduct appear deceptive, but that there was no falsification or wrongdoing involved.

The Government maintains that Malmstrom knew about the fraudulent activities and participated in the scheme to prepare false documents. The evidence showed Malmstrom discussed the practice of falsely stating down payments with his manager and another salesman. There was also evidence that he prepared false documents about customers' down payments or income information. Viewing this evidence in the light most favorable to the Government, a rational jury could conclude beyond a reasonable doubt that Pat Malmstrom conspired and aided and abetted the commission of such fraud.

Larry Meinzer argues the evidence was insufficient to support his conviction for aiding and abetting. While Meinzer does not

dispute that the loan packages connected to the sales he made contained false documents, Meinzer argues that the evidence did not show that he was personally involved in the falsified sales. The Government argues that the evidence supported the jury's inference that Meinzer knew the information he submitted would be falsified considering the overall fraudulent practices at A-1. The evidence also showed that Meinzer was involved in preparing false documents. His argument that the bank was never induced to extend funds on the basis of the documents he prepared, some of which contained false information, does not vitiate the proof that he purposefully participated in a criminal venture to obtain funds falsely. Viewing this evidence in the light most favorable to the Government, a rational jury could conclude beyond a reasonable doubt that Larry Meinzer aided and abetted the commission of bank fraud.

Tammy Morrow argues the evidence was insufficient to support her conviction for aiding and abetting. She argues that her acquittal of conspiracy should show that the evidence did not support a conclusion of aiding and abetting. She asserts there is no evidence that she acted in any affirmative manner to aid the venture. The Government contends that the jury could infer that she knowingly and voluntarily participated in the scheme to defraud the bank by submitting loan information that she was aware would be fraudulently altered. The testimony of the Government's witnesses against Morrow demonstrated that Morrow knew of the short down

12

payment practice, and that she told her customers to lie to the bank about the down payment if contacted by the bank. This was enough.

Gene Trout maintains that there was no evidence to show his intent to defraud the banks or to participate in a conspiracy to do so; that the Government's witness, Janet Dees, testified that she had no knowledge of whether Trout was ever told about the short down payment technique. Trout argues that he was so ignorant of what was happening that A-1 cheated him on his commissions. According to Trout, because the other Government witnesses never testified directly that Trout prepared or talked about falsified documents, or that he knew about the practice of falsifying documents, the evidence did not prove beyond a reasonable doubt that he committed or aided and abetted bank fraud or conspiracy to commit it.

The Government maintains that the evidence showed that false documents were submitted in connection with Trout's sale of three mobile homes. Although Trout was "in and out" of the office during the closing transactions, the jury could infer that he had full knowledge that the packages would be submitted to the bank with fraudulent information. Also, there was testimony by one of Trout's customers that Trout told her about the inflated down payment practice and directed her to submit a falsified gift letter to secure the financing on their mobile home purchase. This was enough.

13

Defendants Barber, Cain, Cox, Davis, Freeman, Long, Malmstrom, Meinzer, and Morrow argue that they were improperly joined in the indictment and that the trial court abused its discretion by denying their motions for severance. Proper joinder requires that the offenses charged "must be shown to be part of a single plan or scheme," and that "[p]roof of such a common scheme is typically supplied by an overarching conspiracy from which stems each of the substantive counts." United States v. Faulkner, 17 F.3d 745, 758 (5th Cir. 1994)(quoting United States v. Lane, 735 F.2d 799, 805 (5th Cir. 1984), rev'd in part on other grounds, 474 U.S. 438 (1986)). Each of the counts charged in the indictment here stems from a common conspiracy to defraud the Home Savings Association and related bank institutions. Joinder in a single indictment was proper.

Federal Rule of Criminal Procedure 14 provides that a court may order a severance "[i]f it appears that a defendant or the Government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together." Assuming joinder is proper under Rule 8, denial of a motion for severance is reviewable only for an abuse of discretion. See United States v. Bullock, 71 F.3d 171, 174 (5th Cir. 1995). To demonstrate an abuse of discretion, the defendant "'bears the burden of showing specific and compelling prejudice that resulted

in an unfair trial,'" and such prejudice must be of a type "'against which the trial court was unable to afford protection.'" Faulkner, 17 F.3d at 759 (quoting United States v. Pofahl, 990 F.2d 1456, 1483 (5th Cir. 1993)).

The defendants' large broadside is a claim of guilt by association -- prejudice from a large volume of evidence admitted without limiting instructions to insulate them from spillover prejudice. The trial was lengthy, but nothing suggests that the jury was unable to follow the evidence, distinguish the various charges, and independently assess each defendant. As much as we know points in the opposite direction. The jury acquitted Davis, Morrow, and Meinzer of conspiracy to commit bank fraud, and Cox and Cain of bank fraud under Count 16. This suggests that the jury considered separately the evidence as to each defendant and each count. Further, the court instructed the jury that "[t]he fact that these defendants are tried together is not and should not be considered by you as evidence of the guilt of them or any of them." The district court also instructed the jury not to consider the fact that the defendants may have presented evidence, objected, or cross-examined witnesses together. The district court instructed the jury that evidence of similar acts by defendants Billy Cox and Mason Long committed on other occasions should not be considered as to the other defendants; that evidence that related to Counts 14, 15, and 16 was to be considered only as to those counts; and that no defendant was on trial for any other act not alleged in the

indictment.  Similar instructions have been held sufficient to cure prejudice, and juries are presumed to follow their instructions. See Zafiro v. United States, 506 U.S. 534, 540-41 (1993).

2

The defendants also argue that the district court abused its discretion by refusing to sever because Cox admitted the fact of the scheme but contended that the bank was aware of it -- directly at odds with their defense that no scheme was to be proved.  The Government sticks with the mantra that the defendants have failed to articulate specific instances of prejudice and argues that they are not entitled to severance merely because they would have had a better chance of acquittal.  See id. at 538-39.  We have held that "instructions to consider the evidence as to each defendant separately and individually and not to consider comments made by counsel as substantive evidence sufficed 'to cure any prejudice caused when co-defendants accuse each other of the crime.'" United States v. Mann, 161 F.3d 840, 863 (5th Cir. 1998)(quoting United States v. Stouffer, 986 F.2d 916, 924 (5th Cir. 1993)).  The district court gave appropriate instructions.  There is then the matter of the individual defendant's arguments that they ought to have had separate trials.

3

We find Larry Meinzer and Caldwell waived their severance arguments because they cannot adopt their co-defendants' arguments without specifically showing how they were prejudiced.  Their

16

contentions would equally fail for want of a showing of specific prejudice. That is, they waived their contentions, but they were plainly without merit, so they lost nothing for any inaction or improper acts of their counsel.

4

Alice Barber, Pat Malmstrom, and Mason Long argue that their cases should not have been joined; that there was a fatal variance between the indictment, with its single conspiracy, and the proof at trial of multiple and independent conspiracies. To prevail on a material variance claim, these defendants must prove (1) a variance between the indictment and the proof at trial, and (2) that the variance affected their substantial rights. See United States v. Morgan, 117 F.3d 849, 858 (5th Cir.), cert. denied, 118 S. Ct. 454 (1997). Whether the evidence shows one or multiple conspiracies is a question of fact for the jury. See id. The principal considerations in counting the number of conspiracies are (1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlapping of the participants in the various dealings. See id. We will "affirm the jury's finding that the Government proved a single conspiracy unless the evidence and all reasonable inferences, examined in the light most favorable to the Government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt." Id.

The "common goal" factor used to count conspiracies has been defined broadly by this court. See United States v. Morris, 46

17

F.3d 410, 415 (5th Cir. 1995)(holding that the common goal of deriving personal gain from the illicit business of buying and selling cocaine constituted a single conspiracy). The jury could reasonably have concluded that the common goal of the charged conspiracy in this case was to derive personal gain from the sale of mobile homes through the submission of false loan information.

The nature of the scheme and the overlap of participants also support a single conspiracy. There was evidence that Billy Cox, Max Cain, and Mason Long were "key men" who orchestrated the practice of short down payments and falsifying customer information to obtain loan funds for the sale of A-1 mobile homes. The managers and the salesmen at each A-1 lot were the cogs necessary to spin this wheel. Viewed in the light most favorable to the verdict, the efforts of all the defendants convicted of conspiracy were necessary to the overall success of the criminal venture.

Even if we were to conclude that there was a variance, we find that Alice Barber, Pat Malmstrom, and Mason Long have failed to show how the alleged variance affected their substantial rights. We find that the evidence is sufficient to prove each convicted defendant's participation in at least one conspiracy, and none has shown reversible error under joinder and severance principles. "[W]hen the indictment alleges the conspiracy count as a single conspiracy, but the government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights."

18

United States v. Davis, 132 F.3d 1092, 1095 (5th Cir. 1998) (citing Faulkner, 17 F.3d at 762). Finally, as a safeguard against prejudice, the jurors were cautioned in the instructions from finding guilt if the proof presented by the Government established any conspiracy other than that charged in the indictment.

5

Tammy Morrow contends that she was prejudiced by the district court's refusal to sever her case because James Caldwell would then have testified that neither of them knew of any false documentation scheme for financing A-1 mobile homes. The Government replies that she did not provide the trial court with any substantive information about Caldwell's potential testimony. The Government also argues that the trial court did not abuse its discretion by refusing to accept Morrow's attempt at the close of trial to use Caldwell's affidavit. The affidavit stated that Caldwell and Morrow were unaware of any false documentation scheme at A-1 mobile homes. We find no abuse of discretion by the district court in denying Morrow's motion to sever.

6

Billy Cox argues that the district court abused its discretion by denying his motion to sever because the Government presented evidence of witness Robert Harvey's guilty plea. As Cox concedes, this issue has been foreclosed by this court's opinion in United States v. Manges, 110 F.3d 1162, 1176 (5th Cir. 1997), which held that the district court did not abuse its discretion by admitting

19

evidence of a co-defendant's guilty plea which related solely to the co-defendant's credibility. Moreover, the district court instructed the jury that the "fact that an accomplice has entered a plea of guilty to the offense charged is not evidence in and of itself of the guilt of any other person." Id. We find no abuse of discretion by the district court in denying Cox's motion to sever.

V

Defendants Barber, Cain, Caldwell, Cox, Davis, Long, and Malmstrom challenge the district court's refusal to include their proffered jury instructions. We review the refusal to provide a requested instruction for abuse of discretion. See United States v. Asibor, 109 F.3d 1023, 1034 (5th Cir.), cert. denied, 118 S. Ct. 254 (1997). District courts enjoy substantial latitude in formulating jury instructions. We reverse only if the requested jury instruction "(1) was a substantially correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial, the omission of which seriously impaired the defendant's ability to present an effective defense." Id.

1

Defendants Barber, Cox, and Long contend that the district court should have given their requested jury instruction regarding their "good faith" defense. The Government argues that the district court did not abuse its discretion because it allowed the

20

defendants to argue good faith to the jury and substantially covered the defense of good faith in the instruction on requisite knowledge. Defendants, however, maintain that the trial court's instruction that the knowledge and complicity of bank officers is not a defense to the charge of bank fraud undermined their contentions of good faith.

We are persuaded that the jury charge covered the good faith defense. The district court instructed the jury that "the requisite intent to defraud is the defendant acted knowingly and with specific intent to deceive ordinarily for the purpose of causing financial loss to another or bringing about some financial gain to himself." The district court defined the term "knowingly" as an "act [  ] done voluntarily and intentionally and not because of mistake or accident." The district court added that "the purpose of adding the word 'knowingly' is to ensure that no one will be convicted of an act done because of mistake, or accident, or other innocent reason." While the district court did instruct that "[k]nowledge or complicity of bank officers, even all bank officers, is not a defense to a charge of bank fraud," the court explained:

> Still, knowledge or complicity of the officers and board of directors of a financial institution may be considered by the jury along with other factors as a part of a defendant's defense that he or she had no intent to defraud a financial institution. Some defendants in this case have raised such a defense. Some defendants have not. You must consider each defendant separately and individually.

21

James Caldwell and Billy Cox argue that 18 U.S.C. § 1014 (knowingly making false statements to a federally insured lending institution) is a lesser included offense of 18 U.S.C. § 1344 (bank fraud) and that the jury should have been instructed accordingly. The Government argues that because this court has determined that § 1014 and § 1344 each require proof of an additional fact, see Dupre, 117 F.3d at 818, § 1014 is not a lesser included offense. We agree. See also United States v. Fraza, 106 F.3d 1050, 1053 (1st Cir. 1997)(recognizing that "on the plain language of these statutes, the requirements of Blockburger are satisfied"); United States v. Wolfwinkel, 44 F.3d 782, 785 (9th Cir. 1995)(concluding that bank fraud and misapplication of bank funds do not constitute the same offense). There was no error.

3

Billy Cox argues that the district court abused its discretion by refusing to instruct the jury that a mere violation of bank policy was insufficient to convict him of bank fraud as alleged in Count 15. The Government argues that the district court's charge substantially covered the requested instruction.

The charge directed the jury that it must find all the elements of bank fraud. The proffered instruction was substantially covered by the trial court's charge.

4

Pat Malmstrom and Samantha Davis requested that the jury be instructed that it must unanimously find beyond a reasonable doubt that the defendants submitted false or fraudulent documentation in connection with all the loan transactions referred to in each count in order to convict the defendant of that count. The district court's instruction required that the jury unanimously find that the defendant committed at least one and the same materially false or fraudulent pretense or representation. The charge explained that "all of you must agree unanimously that the same false of fraudulent pretense, representation, or promise alleged in a particular count was in fact employed by the particular defendant charged in that count." We find that the district court's instruction was proper because each respective count alleged only one offense under § 1344(2). This was not a situation where a jury could find a defendant guilty on a single count under multiple theories of liability; rather, each respective count alleged only one offense under 18 U.S.C. § 1344(2). We find no abuse of discretion by the district court.

5

Pat Malmstrom argues that the district court erred by giving a Pinkerton instruction. According to Malmstrom, "[t]he evidence did not support the giving of the Pinkerton charge because of the scope of the alleged agreement in this case." The district court instructed the jury in accordance with § 2.22 of this circuit's Pattern Criminal Jury Instructions, Conspirator's Liability for

23

Substantive Count.  Furthermore, we find the district court properly instructed the jury that someone who jointly undertakes a criminal activity with others is accountable for their reasonably foreseeable conduct in furtherance of the joint undertaking.

VI

Defendants Billy Cox, Pat Malmstrom, and Gene Trout assert that the district court committed clear error by upholding the Government's peremptory challenge of juror Joyce Jean Jones, a black woman.  The Government explained that it struck Jones because she had indicated on a questionnaire reviewed before voir dire that she never read magazines, books other than the Bible, and did not watch television.  The Government explained that it rated Jones low before it knew she was black.  The district court accepted the Government's answer as race-neutral stating that it was "legitimately appropriate and in good faith."  We give deference to a district court's finding and evaluation of credibility of the Government's offered reasons for striking a juror.  See Hernandez v. New York, 500 U.S. 352, 364 (1991).

The defendants argue that the Government's proffered reasons for striking Jones were pretextual given that other jurors who preferred religious information were not struck.  In addition, Cox argues that the alleged neutral explanation offered here does not relate to the case.  See Batson v. Kentucky, 476 U.S. 79, 98 (1986)(requiring that the prosecutor articulate a neutral explanation related to the particular case to be tried).  Cox also

24

contends that a Batson challenge cannot be satisfied by a prosecutor's denial of discriminatory intention or affirmation of good faith. See Purkett v. Elem, 514 U.S. 765, 840 (1995). The contentions are without merit. We find no clear error.

VII

Tammy Morrow argues that the district court erred by denying her motion to dismiss the indictment because the prosecution for bank fraud was barred by the statute of limitations. She contends that, at the time of her indictment, 18 U.S.C. § 3282's five-year statute of limitations period applied and had expired; that 18 U.S.C. § 3293, enacted August 9, 1989 and providing a ten-year statute of limitations for prosecutions of violations of § 1344, cannot be applied under the Ex Post Facto Clause.

Congress provided that "the amendments made to this subsection (§ 3293) shall apply to an offense committed before the effective date of this section [August 9, 1989], if the statute of limitations applicable to that offense under this chapter had not run as of such date." 18 U.S.C. § 3292 (noting § 961(l)(3) of Pub. L. No. 101-73). On August 9, 1989, when § 3293 was enacted, the initial five-year statute of limitations provided by § 3282 had not run. The ten-year statute of limitations was properly applied.

We have held that the Ex Post Facto Clause does not preclude the application of § 3293's ten-year statute of limitations for violations of § 1344 committed before § 3293's enactment and prosecuted before the previously applicable limitations period

25

expired. See United States v. Baker, 61 F.3d 317, 326 (5th Cir. 1995); United States v. Bretchel, 997 F.2d 1108, 1112-13 (5th Cir. 1993). While Morrow concedes that her argument is foreclosed by Bretchel, she contends Bretchel was wrongly decided and that the revised statute of limitations is in fact violative of the Ex Post Facto Clause. She maintains that the counts in the indictment against her should have been dismissed because she was not indicted within five years of any relevant conduct. We reject Morrow's arguments and find that the district court correctly denied her motion to dismiss on the basis of the statute of limitations.

## VIII

Max Cain maintains that the district court erred by admitting the following evidence: (1) business records lacking a proper predicate, (2) statements about "feelings and suspicions" lacking a proper predicate, and (3) statements admitted as co-conspirator statements but not made to further a conspiracy.

Our standard of review is abuse of discretion, and under Fed. R. Evid. 103(a), an erroneous evidentiary ruling is reversible error only if a party's substantial rights are affected. See Carroll v. Morgan, 17 F.3d 787, 790 (5th Cir. 1994).

### 1

Cain argues that approximately 300 documents from Home Savings were improperly admitted through Wilma York, the records custodian for First American, the successor of First America. Cain asserts that York admitted that she had no personal knowledge as to how the

26

record-keeping system worked at Home Savings and thus could not meet the requirements of Federal Rule of Evidence 803(6).

Rule 803(6) turns on the reliability or trustworthiness of the records. See United States v. Box, 50 F.3d 345, 356 (5th Cir. 1995). We are persuaded that York's testimony established that the documents had sufficient indicia of reliability. The district court found the records authentic, and York explained how she came to possess them and how they were maintained. We find no reversible error in the admission of these records.

Next, Cain contends that the testimony of Government witness Gwendolyn Williams, who had worked at the Bryan A-1 for two months in 1987, that she was suspicious that "something was wrong" at the A-1 lot was inadmissible. She also testified that after being warned by James Alford about A-1, she left her employment there. Cain argues that Alford was never mentioned as a co-conspirator so anything he said was impermissible hearsay.

Cain did not object to Williams' testimony as improper lay opinion under Federal Rule of Evidence 702. Cain claims that there was a "running objection to her testimony," but the record is unclear as to the basis of that running objection. Rather, Cain objected on grounds of relevancy and hearsay, objections overruled by the district court. Cain's substantial rights were not affected.

Cain also argues that the district court improperly admitted the testimony of Tim Howard, an A-1 salesman from 1987 until 1990.

27

Howard testified that on one occasion the bank discovered three short down payments in a one week period. Howard also testified that Cain's disapproval of short down payments made during a phone conference with Cox, Howard, and Tim Matthews was "just a show." Cain contends that Howard lacked personal knowledge and that his statements were speculations about A-1 based on a conversation with Cain in which Cain told him "they were not doing these things." The Government argues that Howard's testimony about Cain's telephone conversation being "just a show" was not speculation. It was based on the fact that Billy Cox told Howard that Cain already knew about the short "downs" because Cain was aware of the fraud at A-1. Howard's testimony was admissible. It was based on personal knowledge of events and conversations with co-conspirators.

Cain complains that the statements by Tim Howard and Janna Kimbrough were inadmissible hearsay because they did not fall within the co-conspirators exception of Federal Rule of Evidence 801(d)(2)(E). Cain challenges Howard's testimony concerning a conversation Howard had with Billy Cox in which Cox talked of a customer who had purchased a mobile home but had no heat. Cox allegedly said that Max Cain had gotten all the money. Cain argues that this statement was not made in furtherance of the conspiracy. There was no objection to this testimony. Absent a timely objection, we review for plain error. See Marceaux v. Conoco, 124 F.3d 730, 734 (5th Cir. 1997). Reversal for plain error is appropriate only where the alleged error was obvious, substantial,

28

and, if not corrected, would "'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" Id. (quoting Highlands Ins. Co. v. Nat'l Union Fire Ins. Co., 27 F.3d 1027, 1032 (5th Cir. 1994)). The district court's admission of Tim Howard's testimony was not plain error.

Cain protests the admission of Janna Kimbrough's testimony. Before she testified, Cain objected that any statements made by Howard to Kimbrough had nothing to do with Cain and did not further the conspiracy. The district court overruled this objection. Kimbrough then testified to the following: "Tim told me if he would have a problem on a house that was already delivered and he absolutely could not get a loan officer to approve, then he told me that he would call Billy and Billy would call Max and just go over the loan officer's head." The district court properly admitted this testimony under Federal Rule of Evidence 801(d)(2)(E).

IX

Pat Malmstrom argues the district court abused its discretion by denying his motion to dismiss. He contends that the indictment failed to state an offense, was vague, duplicitous, and that striking language from one of the counts resulted in a constructive amendment.

1

Malmstrom claims that Count 12 failed to allege false representations with sufficient specificity to provide him adequate notice; that the government referred only to general "false

29

information and documents." Pointing to United States v. Lang, 766 F. Supp. 389, 395-96 (D. Md. 1991), he urges that the indictment must identify some of the alleged false statements.

The Government responds that the charged crimes were clear. The Government asserts that Lang, which dealt with a violation of 18 U.S.C. § 1001 (making a false statement), is inapplicable because the court held failure to set forth the false entries with particularity did not require dismissal of the indictment. In addition, the Government claims that Malmstrom cites no authority for his contention that counts of an indictment for conspiracy and bank fraud must specify each false document and what portion is false.

We review the sufficiency of an indictment de novo. See Asibor, 109 F.3d at 1037. The purpose of the indictment is "to allege each essential element of the offense charged so as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding." United States v. Cluck, 143 F.3d 174, 178 (5th Cir. 1998), cert. denied, 119 S. Ct. 808 (1999) (quoting United States v. Webb, 747 F.2d 278, 284 (5th Cir. 1984)). The proper test for determining the validity of the indictment is whether the defendant has been prejudiced by the alleged deficiency. See United States v. Crow, 164 F.3d 229, 234 (5th Cir. 1999).

The indictment cites § 1344(2) and tracks the statutory language for bank fraud. It outlines the facts of the offense by

describing the kind of false information submitted, the approximate date, and the A-1 customer involved.  We find that the indictment was not vague and provided adequate notice to Malmstrom of the charges against him.

2

Malmstrom argues that the indictment was duplicitous. "'Duplicity' is the joining in a single count of two or more distinct and separate offenses." United States v. Elam, 678 F.2d 1234, 1250 n.27 (5th Cir. 1982).  See generally 1 Charles Alan Wright, Federal Practice and Procedure § 142 (1982).  Rule 12(f) of the Federal Rules of Criminal Procedure requires a party to raise defenses and objections based on defects in the indictment before trial or waive them absent good cause shown.  Even if Malmstrom did object, the six overt acts alleged in the indictment arise from the same offense of bank fraud.

3

Malmstrom argues that the district court erred in allowing the Government to strike paragraph 3 of Count 12 relating to false documents for the Michelle Henry purchase.  Malmstrom moved to dismiss Count 12 on the basis that striking paragraph 3 was an unconstitutional amendment of the indictment and violated his Fifth Amendment right to be tried on charges returned by the grand jury. Malmstrom contends that the grand jury might not have indicted him without the Henry transaction.

The Fifth Amendment guarantees that a criminal defendant will be tried only on charges presented in a grand jury indictment. "Incident to this constitutional guarantee is the longstanding principle of our criminal justice system that the charges contained in an indictment may not be broadened or altered through amendment, except by the grand jury itself." United States v. Restivo, 8 F.3d 274, 279 (5th Cir. 1993). A constructive amendment occurs "when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged." United States v. Holley, 23 F.3d 902, 912 (5th Cir. 1994). If an instruction constructively amends the indictment, we must reverse the conviction. See Restivo, 8 F.3d at 279.

The deletion of one of the alleged acts did not modify the essential elements of the charged offense or broaden the indictment. There was no evidence presented to the jury about the Henry transaction, and the indictment was read with any language related to that transaction eliminated. This "amendment" neither subjected Malmstrom to trial on charges not made in the indictment nor effectively changed the factual basis of the indictment.

4

Pat Malmstrom argues that the district court should have permitted him to call as a witness the deputy district court clerk to substantiate his allegation that there was a secret agreement between the Government and one of its witnesses, Scott Brill, to delay Brill's sentencing. Brill, an alleged co-conspirator,

testified on direct examination that the Government made no promises to him outside the plea agreement to delay his sentence. On cross-examination, however, Brill acknowledged that the Government promised to request the court to delay his sentencing until after he testified at trial. The Government called Special Agent Terry Lane who testified no such promises were made to Brill outside the plea bargain agreement.

Consequently, Malmstrom requested the Deputy District Court Clerk testify as to the relevant dates that Brill pleaded guilty and the various orders continuing his sentence. According to Malmstrom's appeal brief, the evidence was being offered to demonstrate Brill's bias and to impeach Agent Lane's testimony. A review of the record, however, shows that Malmstrom argued that he was not trying to impeach Agent Lane. Malmstrom's counsel stated:

> [T]his doesn't have anything to do with impeaching Mr. Lane. This goes to prove that Mr. Brill was promised that his sentencing was going to be delayed until after he testified in this trial which goes to his bias in testifying for the Government. It's not to impeach anybody.

The Government objected on grounds that it would be highly prejudicial and improper collateral impeachment to have the Deputy District Court Clerk testify. The district court denied Malmstrom's request.

Malmstrom argues that the district court's ruling prevented him from showing bias by Scott Brill and prevented him from impeaching Agent Terry Lane. Although "[t]he partiality of a

33

witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony," United States v. Landerman, 109 F.3d 1053, 1062 (5th Cir. 1997) (quoting Davis v. Alaska, 415 U.S. 308, 316 (1974)), it is well-established that a district court is afforded broad discretion in determining the probative value of evidence to determine its admissibility. See id. (citing United States v. Abel, 469 U.S. 45, 50 (1984)). In this situation, the district court considered Malmstrom's allegation that there was a secret agreement between the Government and Brill, but concluded that the several continuations of Brill's sentencing were not part of a "secret agreement" because on some occasions the delays were initiated at the direction of the probation officer and through the court. The district court offered Malmstrom the opportunity to make his record by questioning the probation officer outside the presence of the jury, but Malmstrom declined. It was clear from Brill's testimony that, at the time of the trial, he had not yet been sentenced. Given these circumstances, we find no abuse of discretion by the district court.

X

Defendants Caldwell, Cox, Davis, Freeman, Long, Malmstrom, Morrow, Meinzer, and Trout argue that the district court erred by denying their motions for a new trial based on prosecutorial

34

misconduct.[1]  Our "task in reviewing a claim of prosecutorial misconduct is to decide whether the misconduct casts serious doubt upon the correctness of the jury's verdict."  United States v. Kelley, 981 F.2d 1464, 1473 (5th Cir. 1993).  We consider the following: "(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt."  United States v. Tomblin, 46 F.3d 1369, 1389 (5th Cir. 1995).  A defendant must show that the prosecutor's statements affected his substantial rights.  See id.  The district judge's assessment of the prejudicial effect carries considerable weight.  See United States v. Munoz, 150 F.3d 401, 415 (5th Cir. 1998), cert. denied, ---S. Ct.---, 1999 WL 16207, 67 USLW 3458 (U.S. Jan 19, 1999) (No. 98-7239).

1

The district court was concerned about generalizations made about A-1 salesmen and their knowledge.  It granted defendants' motion in limine prohibiting the Government from presenting evidence that implied that "it would be impossible to work for A-1 for a week and not know crimes were being committed."  The defendants objected approximately 49 times based on alleged violations of this limine restriction, and the district court

---

[1]Max Cain's attempt to adopt by reference, pursuant to Fed. R. App. P. 28(I), the arguments of his co-defendants fails because the issue of prosecutorial misconduct is fact specific.

sustained approximately 23 objections.  The defendants argue that the Government's repeated violations severely prejudiced them.

On several occasions, the district court noted it did not find the Government's comments to be violations of the limine motion. For example, the district court explained, "I do not accept the fact that the Government is trying to get away with stuff here," and, "My view is that the Government has been scrupulous in its efforts to abide by my limine motions and my other restrictive orders," as well as, "I do not believe the Government's violation of limine motions when objections have been sustained have in any way caused this case to be unfair."  We find no abuse of discretion.

2

Defendants Davis, Freeman, Long, Malmstrom, and Meinzer also claim that the Government grossly misstated the evidence during its rebuttal; that the Government mischaracterized testimony to bolster its argument that everyone at A-1 knew about the fraud; that they were unfairly prejudiced by the Government's conduct.

After reviewing the relevant testimony, we reject the contention.  We do not find that any misstatements were of such a magnitude as to impact the defendants' substantial rights or to undermine the correctness of the jury's verdict.  The district court here correctly denied the motion for a new trial.

3

Gene Trout complains about the prosecutor's remark during rebuttal that the jury "should be insulted" by Trout's counsel's reading of an FBI 302 statement which Agent Terry Lane took from some mobile home consumers. Trout objected but was overruled. The district court addressed the jury and explained that the "attorneys have acted properly in this case in their efforts to represent their clients." The district court also noted attorneys sometimes use hyperbole and that the rebuttal remarks by the prosecutor were argument, not evidence. The district court determined that Trout's counsel was not personally attacked and reiterated that Trout's counsel "conducted himself properly in all respects." We find no basis for reversal for prosecutorial misconduct on this issue.

4

Billy Cox complains that the Government's argument as a whole deprived him of a fair and impartial trial. He lists 24 passages that allegedly demonstrate prejudicial prosecutorial misconduct. Cox did not object to 14 of the items listed and some of the other items do not pertain to him. If a defendant fails to object to an improper argument, we will reverse only for plain error. See United States v. Livingston, 816 F.2d 184, 195 (5th Cir. 1987). We find no plain error in any of the passages to which Cox failed to object. As to the remaining 10 passages, we find no basis for reversal because of improper prosecutorial remarks. The district court maintained admirable control over this long, complicated trial and effectively cured any questionable or improper comments

37

by the prosecutor with an instruction to the jury. We are not persuaded that the alleged prosecutorial misconduct substantially affected the defendants' rights to a fair trial. See United States v. Diaz-Carreon, 915 F.2d 951, 956 (5th Cir. 1990).

5

During its final argument, the Government made generalized comments that it was going to talk about "some undisputed points" and argued those included massive fraud, intent to defraud, conspiracy, and open discussions about short down payments and other falsifications. James Caldwell objected, arguing that these statements by the Government indirectly commented on his failure to testify by labeling the evidence as undisputed. Caldwell avers that the Government's comments were meant to remind the jury that he had remained silent. He also asserts that the Government's comments shifted the burden of proof to him.

We review de novo whether a prosecutor's argument is an impermissible comment on the defendant's right not to testify. See United States v. Martinez, 151 F.3d 384, 392 (5th Cir.), cert. denied, 119 S.Ct. 572 (1998). A prosecutor's remarks constitute impermissible comment on a defendant's right not to testify if the prosecutor's manifest intent was to comment on the defendant's silence or if the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence. See id. (citing United States v. Mackay, 33 F.3d 489, 495 (5th Cir. 1994)). Intent is not considered

38

"manifest" if there is an equally plausible explanation of the prosecutor's remark. See United States v. Johnston, 127 F.3d 380, 396 (5th Cir. 1997), cert. denied, 118 S. Ct. 1174 (1998) (citing United States v. Collins, 972 F.2d 1385, 1406 (5th Cir. 1992)). Also, the challenged remarks must be considered in the context of the case in which they are made. See id. (citing United States v. Montoya-Ortiz, 7 F.3d 1171, 1179 (5th Cir. 1993)). Reversal is warranted if the improper comment had "a clear effect on the jury." United States v. Rocha, 916 F.2d 219, 232 (5th Cir. 1990).

After reviewing the record, we find that none of the prosecution's comments expressly discussed Caldwell's failure to testify. Viewed in context, the prosecution's comments neither manifest an intent to comment on the defendant's failure to testify nor would they naturally and necessarily have been interpreted by the jury as a comment on the defendant's failure to testify. See Johnston, 127 F.3d at 396. Further, "commenting on the absence of specific evidence in the record does not constitute a comment on the defendant's failure to testify when witnesses other than the defendant could have testified to such information." Green v. Johnson, 160 F.3d 1029, 1042 (5th Cir. 1998), cert. denied, 119 S. Ct. 1107 (1999) (citing Nichols v. Scott, 69 F.3d 1255, 1284 (5th Cir. 1995); United States v. Fierro, 38 F.3d 761, 772 (5th Cir. 1994)). We hold that the prosecutor's remarks about the undisputed evidence were not improper.

XI

Defendants Barber, Cain, Caldwell, Cox, Davis, Malmstrom, Morrow, and Trout challenge the district court's application of the Sentencing Guidelines.[2]   This court reviews a district court's application of the sentencing guidelines de novo and findings of fact under a clearly erroneous standard.   See United States v. Lucas, 157 F.3d 998, 1000 (5th Cir. 1998).   But cf. United States v. Koon, 518 U.S. 81, 96-100 (1996) (holding that a district court's decision to depart from applicable sentencing range under Sentencing Guidelines should be reviewed for abuse of discretion, rather than de novo).   A defendant's sentence must be upheld unless she demonstrates that it was imposed in violation of the law, was imposed because of an incorrect application of the guidelines, or is outside the range of applicable guidelines and is unreasonable. See United States v. Parks, 924 F.2d 68, 71 (5th Cir. 1991); see also 18 U.S.C.A. § 3742(f).

1

Section 2F1.1 of the Sentencing Guidelines governs sentence enhancements for offenses involving fraud or deceit.   In determining the loss, the application notes provide:

> In fraudulent loan application cases ... the loss is the actual loss to the victim....   For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has

---

[2]Defendants Freeman, Meinzer, and Long do not raise any sentencing issues in their briefs and attempt to adopt, pursuant to Rule 28(I), the arguments of their co-defendants.

40

> recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used. U.S.S.G. § 2F1.1, comment. (n.8(b)).

Relying on U.S.S.G. § 2F1.1 and the presentence report, the district court calculated the loss to the bank as the total loan amounts that were fraudulently procured at each lot. Various amounts were attributed to each defendant based on the dates the individuals started working at A-1 and the loan amount incurred at a specific lot.

The district court concluded that each applicable loan amount manifested "intended loss" because the defendants acted with indifference or reckless disregard by exposing the bank to a loss of the total loan without considering whether repayment could ever be made. The district court relied on United States v. Wimbesh, 980 F.2d 312, 316 (5th Cir. 1993), abrogated on other grounds, Stinson v. United States, 508 U.S. 36, 40 (1993), which held that, even though the banks did not lose the full value, the face value of stolen and forged checks was properly used as intended loss because that was the amount at risk.

Defendants Barber, Cain, Cox, Morrow, and Trout argue that the district court erred in its calculation of loss under U.S.S.G. § 2F1.1 by using the "intended loss" instead of the "actual loss." The district court's calculation of loss under § 2F1.1 is a finding of fact reviewable only for clear error. See United States v. Randall, 157 F.3d 328, 330 (5th Cir. 1998) (citing United States v.

41

Tedder, 81 F.3d 549, 550 (5th Cir. 1996)); United States v. Hill, 42 F.3d 914, 919 (5th Cir. 1995)(applying clear error standard of review to an amount of loss finding and specifically rejecting defendant's argument for de novo review based on the legal significance of the facts).  Given this standard of review, the only question we must address is whether the record supports the district court's determination that the defendants did in fact intend to inflict a loss in the total amount of the fraudulently obtained loans.

While not fully developed, the record strongly indicates that the "actual loss" to the bank was less than the "intended loss."  The defendants argue that they did not intend to defraud the bank of the entire loan amount and that deductions should have been made to account for the loans the bank had been repaid and the amounts that could have been recouped in foreclosures or similar remedies.

When reviewing the calculation of an intended loss, we look to actual, not constructive, intent, and distinguish between cases in which "the intended loss for stolen or fraudulently obtained property is the face value of that property" and those in which the intended loss is zero because "the defendant intends to repay the loan or replace the property." United States v. Hill, 42 F.3d 914, 919 (1995)(quoting United States v. Henderson, 19 F.3d 917, 928 (5th Cir. 1994)).  The case at hand illustrates a situation in which there is neither evidence of actual intent to cause the loss of the entire loan nor evidence of an actual intent to repay the

42

loan. Here, the repayment of the loans was in the control not of the defendants, but of the mobile home consumers. There was no evidence that the defendants intended to repay the loans if the mobile home consumers failed to make their payments. The district court accurately characterized the defendants as "consciously indifferent or reckless" about the repayment of the loans.

In Tedder, a fraudulent loan application case where there was no evidence that the defendant had any control over the repayments, we held that the intended, rather than the actual, amount of loss was the appropriate measure for sentencing purposes. See Tedder, 81 F.3d at 551 ("[W]here the defendant does not intend to repay, and the actual loss is less than the intended loss, . . . then the full intended loss is the appropriate basis for calculation."). Likewise, we cannot say that the district court erred by using the intended, rather than the actual, amount of loss because the defendants in this case had no control over whether the mobile home consumers would repay the loans. Further, we find no basis for finding the district court's reliance on the presentence report clearly erroneous.

2

Under the Sentencing Guidelines, the sentencing range for a particular offense is determined on the basis of all "relevant conduct" in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction. See U.S.S.G. § 1B1.3. The scope of relevant conduct attributable to a

43

defendant for sentencing purposes is "all reasonably foreseeable acts and omissions of others in furtherance of ... jointly undertaken criminal activity."  "Jointly undertaken criminal activity" is defined as "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy."  Id.  Each of these determinations ("reasonable foreseeability," "in furtherance," and the existence of "jointly undertaken criminal activity") is factual and therefore is reviewed under the clearly erroneous standard. See United States v. Hull, 160 F.3d 265, 268-69 (5th Cir. 1998), cert. denied, 119 S. Ct. 1091 (1999).

Co-conspirator liability under § 1B1.3 does not automatically arise because of participation in a conspiracy.  See id. at 269. A court must make particularized findings that the elements of foreseeability and scope of agreement have been met.  See id.  "The scope of jointly undertaken criminal activity for which a defendant is held responsible encompasses 'the specific conduct and objectives embraced by the defendant's agreement.'"  Id. (citing U.S.S.G. § 1B1.3(a)(1)(B), comment. (n. 2)).  Commentary Note 2 provides:

> In order to determine the defendant's accountability for the conduct of others..., the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake.... In determining the scope of the criminal activity that the particular defendant agreed to jointly undertake, the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.  U.S.S.G. § 1B1.3(a)(1)(B), comment. (n. 2).

44

We note that "'the scope of criminal activity jointly undertaken by the defendant ... is not necessarily the same as the scope of the entire conspiracy.'" United States v. Hull, 160 F.3d 265, 270, cert. denied, 119 S.Ct. 1091 (1999) (quoting U.S.S.G. § 1B1.3, comment. (n. 2)). Thus, the question we must review is whether the district court clearly erred in its determination about the existence of "jointly undertaken criminal activity," the actions taken in furtherance of it, and whether those actions were reasonably foreseeable.

The facts of this case show that Max Cain, Billy Cox, and Mason Long acted as the "key men" in the overall conspiracy to defraud the bank in order to obtain loans for A-1 mobile homes. We find that the district court's determination of relevant conduct as to these three defendants was not clearly erroneous.

The district court's assessment of relevant conduct as to the remaining defendants, however, was clearly erroneous. The remaining defendants, Alice Barber, James Caldwell, Sammy Davis, David Freeman, Pat Malmstrom, Tammy Morrow, Larry Meinzer, and Gene Trout, were employed at an A-1 lot (or lots) for a particular amount of time. While the indictment alleged the conspiracy ended on February 1, 1990, the district court attributed losses to these employee defendants from the day they commenced employment with A-1 until April 3, 1990. We note that each employee defendant appealed

45

the district court's loss calculations,[3] and we conclude that given the facts of this case, the district court committed clear error by including losses beyond the employment period of these individual defendants.

The employee defendants, convicted for fraudulent loan applications, gathered and submitted the false information as a function of their jobs at their particular A-1 lots. Thus, employment was a prerequisite for participation in this conspiracy. Given these circumstances, we find that the scope of the criminal activity each employee defendant agreed to jointly undertake could include only those loans that were processed at the particular lot (or lots) at which that defendant was employed.

The Sentencing Guidelines offer an analogous illustration:

> Defendant O knows about her boyfriend's ongoing drug-trafficking activity, but agrees to participate on only one occasion by making a delivery for him at his request when he was ill. Defendant O is accountable under subsection (a)(1)(A) for the drug quantity involved on that one occasion. Defendant O is not accountable for the other drug sales made by her boyfriend because those sales were not in furtherance of her jointly undertaken criminal activity (i.e., the one delivery). U.S.S.G. §

---

[3]Although challenges to the application of the Sentence Guidelines are generally fact-specific and cannot be adopted by reference pursuant to Fed. R. App. P. 28(I), we find in this instance that the challenge to the district court's loss calculations are not fact-specific. The challenge raises the general question of whether to assess the defendants with losses occurring at time periods other than those during which they were employed and does not require us to make any fact-specific inquiries.

46

1B1.3, illus. (5); see also U.S.S.G. § 1B1.3, illus. (7).[4]

Like the girlfriend in the illustration, each defendant engaged in "jointly undertaken criminal activity" consisting only of those transactions that occurred while the defendant worked for A-1.  Once the employment ended, the criminal activity ceased being "jointly undertaken."  Just as the girlfriend, who was aware of her boyfriend's on-going drug enterprise, was "not accountable" for her boyfriend's other drug sales because the other sales were not in furtherance of her jointly undertaken criminal activity (the one delivery), on the unique facts before us these particular defendants ought not have charged to their sentencing account fraudulent loans "made after leaving the employ of A-1."  They were sufficiently aware of the ongoing activity to be found guilty of joining a conspiracy.  Their employment was the door to that participation.

Accordingly, we must vacate the sentences of Alice Barber, James Caldwell, Sammy Davis, David Freeman, Pat Malmstrom, Tammy Morrow, Larry Meinzer, and Gene Trout and remand for resentencing using each defendant's date of employment as the outside boundary

---

[4]We note that illustrations, like commentary, are generally binding on the courts.  See U.S.S.G. § 1B1.7, comment. ("Portions of [the Guidelines Manual] not labeled as guidelines or commentary ... are to be construed as commentary and thus have the force of policy statements."); Stinson v. United States, 508 U.S. 36, 38 (1993) (holding that the "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline").

in which to calculate the losses attributable to each one. That calculation must keep the inside boundaries in mind. Specifically, a defendant's relevant conduct does not include conduct of others occurring before a defendant joined the criminal venture because it is not "reasonably foreseeable." U.S.S.G. § 1B1.3(a)(1)(B) comment. 2; see also United States v. Carreon, 11 F.3d 1225, 1235-38 (5th Cir. 1994). The district court must determine, by a preponderance of the evidence, the date that each defendant joined and left the criminal venture. See U.S.S.G. § 6A1.3, comment. (explaining that due process requires that facts relevant to sentencing be proved by a preponderance of the evidence). After determining the proper dates, the district court should again apply the intended loss findings based on the amount of loans fraudulently procured at each lot. In other words, the losses attributed to each defendant will be the total amount of fraudulent loans procured during the defendant's applicable dates and at the particular lot(s) at which the defendant was employed or a lesser period in which he was employed but had not joined the illegal activity.

3

James Caldwell argues that the district court attributed losses to him that occurred before the date of his first alleged overt act in the conspiracy, which was June 8, 1988. The district court found him responsible for losses incurred from February 16, 1988 (his employment began on February 4) until the end of the

48

conspiracy. The Government argues that the district court did not err because Caldwell's presentence report offered evidence to support the conclusion that Caldwell was a knowing participant in the bank fraud scheme throughout his employment.

We have held that a district court can adopt facts contained in a presentence report without inquiry, if those facts had an adequate evidentiary basis and the defendant does not present rebuttal evidence. See United States v. Puig-Infante, 19 F.3d 929, 943 (5th Cir. 1994). The defendant has the burden of showing that information that the district court relied on in sentencing is materially untrue. See id. We find that Caldwell has failed to meet his burden. Moreover, the district court did not clearly err in its determination that Caldwell joined the conspiracy shortly after he began working for A-1.

4

Malmstrom's presentence report contained statements about FBI records documenting fraudulent activity which the probation officer researched on microfiche and determined were in fact fraudulent.[5] Malmstrom argues that the district court improperly used these findings, which were not elements of the charged offenses, and deprived him of the right to confront witnesses and cross-examine them on these alleged facts. As Malmstrom concedes, the Supreme

---

[5]The prosecution explained to the sentencing court that each of the loans listed in the probation report was determined to be fraudulent due to short down payments according to interviews with other defendants or purchasers.

49

Court has not decided whether the Sixth Amendment Confrontation Clause applies to sentencing proceedings.

Confrontation rights at sentencing hearing are restricted. See United States v. Rodriquez, 897 F.2d 1324, 1328 (5th Cir. 1990). In this case, the findings of the presentence report, which the court adopted, were supported by evidence from the trial and investigative research by the FBI and the probation office. "If information is presented to the sentencing judge with which the defendant would take issue, the defendant bears the burden of demonstrating that the information cannot be relied upon because it is materially untrue, inaccurate or unreliable." United States v. Angulo, 927 F.2d 202, 205 (5th Cir. 1991). Malmstrom failed to rebut the presentence report with any evidence other than an argument that all the loans listed were not fraudulent. Objections in the form of unsworn assertions do not bear sufficient indicia of reliability to be considered. See United States v. Lghodaro, 967 F.2d 1028, 1030 (5th Cir. 1992). Because any information may be considered, so long as it has "sufficient indicia of reliability to support its probable accuracy," and because Malmstrom was given the opportunity at the sentencing hearing to present evidence to the contrary, we find that Malmstrom's confrontation rights were not abridged. United States v. Marshall, 910 F.2d 1241, 1244 (5th Cir. 1991).

5

Pat Malmstrom worked at the Waco A-1 for three months as a salesman while he was in college.  Gene Trout worked at the Bryan A-1 for three months as a salesman.  They argue that the district court erred by refusing to grant them a two level reduction pursuant to U.S.S.G. § 3B1.2(b) for being minor participants.  Samantha Davis, who worked only 4 weeks at the Bryan A-1 and was acquitted of the conspiracy charge, argues that she deserved a four level reduction as a minimal participant.  The Government argues that the district court did not err in evaluating each of these defendants' fraudulent activity as "average" and determining that these defendants were not less culpable than most of the others.

Section 3B1.2 of the Sentencing Guidelines is designed to reduce a sentence when the defendant is substantially less culpable than the average participant in the offense.  See United States v. Edwards, 65 F.3d 430, 434 (5th Cir. 1995).  Section 3B1.2 provides:

> Based on the defendant's role in the offense, decrease the offense level as follows:
>
> > (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
> >
> > (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
>
> In cases falling between (a) and (b), decrease by 3 levels.

A judicial fact-finding that a defendant is not a minimal or minor participant is reviewed under the clearly erroneous standard.  See United States v. Pofahl, 990 F.2d 1456, 1485 (5th Cir. 1993).

51

Given this standard and § 3B1.2's comment that "a downward adjustment for a minimal participant will be used infrequently," U.S.S.G. § 3B1.2, comment. 2, we must affirm the district court's determination.

Davis also argues that the district court erred by including a two level upward adjustment for involvement with more than minimal planning under U.S.S.G. § 2F1.1(b)(2)(A). The guidelines define "more than minimal planning" as "more planning than is typical for commission of the offense in a simple form," or "[taking] affirmative steps . . . to conceal the offense." U.S.S.G. § 1B1.1, comment. (n. 1(f)). She claims that the district court failed to make adequate findings to support this upward adjustment.

A district court can adopt facts contained in a presentence report without inquiry, if those facts had an adequate evidentiary basis and the defendant does not present rebuttal evidence. See Puig-Infante, 19 F.3d at 943. Here, we find that the presentence report was sufficiently reliable and Davis failed to present any rebuttal evidence. Therefore, we review the district court's determination of "more than minimal planning" for clear error. See United States v. Brown, 7 F.3d 1155, 1159 (5th Cir. 1993). We find none.

6

James Caldwell argues that the district court should not have included in its calculation of his criminal history category his

52

three uncounseled misdemeanor convictions for DWI and theft offenses that each resulted in actual imprisonment. He relies on Nichols v. United States, 511 U.S. 738, 748-49 (1994), which provides, "[A]n uncounseled misdemeanor conviction, valid under Scott [v. Illinois],[6] because no prison term was imposed, is also valid when used to enhance punishment at a subsequent conviction . . . ." Caldwell reasons from Nichols that because he **was** imprisoned, his misdemeanor convictions cannot be used to enhance his punishment. We find Caldwell's reasoning flawed because the focus of the Nichols holding is not on whether the defendant was imprisoned, but on whether the conviction was validly obtained. See, e.g., United States v. Hoggard, 61 F.3d 540, 543 (7th Cir. 1995).

The Sixth Amendment protects the principle that no imprisonment may be imposed on the basis of an uncounseled conviction, unless the defendant waives his right to counsel. The record demonstrates that Caldwell signed a waiver of counsel for each of his prior convictions that resulted in jail time.[7] Therefore, the three uncounseled convictions were validly obtained. We find that the district court did not err by including Caldwell's

---

[6]In Scott, the Supreme Court held that as long as no imprisonment was actually imposed, a defendant's Sixth Amendment right to counsel did not apply. See Scott v. Illinois, 440 U.S. 367, 373-74 (1979).

[7]At the sentencing hearing, Caldwell argued that his waivers were involuntary, but he makes no such argument on appeal.

three uncounseled convictions in its calculation of his criminal history category.

## XII

The judgments of conviction are affirmed.  The sentences of Max Cain, Billy Cox, and Mason Long are affirmed.  The sentences of Alice Barber, James Caldwell, Sammy Davis, David Freeman, Pat Malmstrom, Tammy Morrow, Larry Meinzer, and Gene Trout are vacated, and the case is remanded to allow the district court to impose new sentences in accordance with this opinion.

AFFIRMED IN PART and VACATED IN PART.