# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 27, 2011

Lyle W. Cayce
Clerk

No. 09-20813

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

TED RUSSELL SCHWARTZ MURRAY,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, PRADO, and OWEN, Circuit Judges.

DAVIS, Circuit Judge:

Following his conviction for making and subscribing to a false tax return and multiple counts of conspiracy, mail fraud, and securities fraud, Ted Russell Schwartz Murray appeals his sentence on the following four grounds: (1) the application of the 2001 version of the United States Sentencing Guidelines[1] (U.S.S.G.) to his case violated the ex post facto clause; (2) the district court used improper methodology in computing the amount of loss under U.S.S.G. § 2B1.1(b)(1); (3) the district court committed plain error in applying the U.S.S.G.

---

[1] All references in this opinion are to the 2001 version.

No. 09-20813

§ 3B1.1(a) leader/organizer enhancement; and (4) the district court imposed a substantively unreasonable sentence. Finding no reversible error, we AFFIRM.

## I. Facts

The appellant, Ted Russell Schwartz Murray (Murray), was the majority shareholder, President, and Chief Executive Officer (CEO) of Premiere Holdings, which was created by merging Murray's solely-owned company, Money Mortgage Corporation of America, with Lapin & Wiggington, an asset management company owned by his codefendants, David Lapin and Carl Wiggington. Premiere solicited money from investors to fund real estate loans through its P72 Program. Murray and his codefendants falsely promised to give investors an interest in safe and secure real estate investments that yielded 12% returns.

In many instances, Premiere lent to highly risky borrowers and did not obtain the high-quality collateral promised to secure the loans. Also, Murray charged a 25% loan origination fee, a material fact that was never disclosed to investors. Because most of the loans Premiere made were nonperforming, later investors' funds were used to pay the promised 12% returns to earlier investors, thus hiding Premiere's true financial condition.

By September 2001, several of the largest loans were in default and Premiere could not recruit enough new investors to hide the losses. Murray and his codefendants used the economic decline following the September 11 terrorist attacks as an excuse for the failure of the P72 Program, and Premiere filed for Chapter 11 bankruptcy on October 2, 2001. At that time, Premiere had outstanding loans totaling $165 million. A group of the defrauded investors (who banded together and asserted their claims under the name Presidential Partnership), Lapin, and the bankruptcy trustee took over the loans in an attempt to recover any outstanding value remaining in the underlying collateral.

After Murray was convicted of all counts by a jury, the district court used the 2001 edition of the Sentencing Guidelines to determine his sentence. He had

2

a base offense level of six under U.S.S.G. § 2B1.1(a). Based on the court's finding that the amount of loss was $84 million, his offense level was raised by 24 pursuant to U.S.S.G. § 2B1.1(b)(1)(M). Murray's offense level was also increased by four because the district court found that he was a leader or organizer. U.S.S.G. § 3B1.1(a). After additional enhancements, Murray's total offense level was 43 with a criminal history category of I. His guidelines sentencing range was 360 months to life. The district court imposed a below-guidelines sentence of 240 months imprisonment with three years of supervised release. Murray appeals that sentence.

## II.

### A. Ex Post Facto Clause

Murray argues first that the district court violated the ex post facto clause when it calculated his sentence using the 2001 version of the Sentencing Guidelines, which became effective November 1, 2001. He argues that the conspiracy ended before that effective date with the filing of the bankruptcy petition on October 2, 2001. Because Murray raises this issue for the first time on appeal, we review for plain error. *United States v. Castillo-Estevez*, 597 F.3d 238, 240 (5th Cir. 2010). To demonstrate reversible plain error, Murray must show "(1) error (2) that is plain and (3) that affects his substantial rights." *Id.* "To be 'plain,' legal error must be 'clear or obvious, rather than subject to reasonable dispute.'" *Id.* at 241 (quoting *Puckett v. United States*, 129 S.Ct. 1423, 1429 (2009)). We will exercise our discretion to correct plain error if it seriously affected the fairness, integrity, or public reputation of the judicial proceeding. *Id.* at 240.

In *Castillo-Estevez*, a panel of this Court held that *United States v. Booker*, 543 U.S. 220 (2005), which rendered the sentencing guidelines advisory, made it unclear and subject to reasonable dispute whether the ex post facto clause prohibits the application of a new advisory guideline to a crime committed before

the guideline's effective date. 597 F.3d at 241. Therefore, regardless of the date the Premiere conspiracy ended, it was not plain error for the district court to apply the 2001 guidelines in determining Murray's sentence. *See United States v. Marban-Calderon*, 631 F.3d 210, 211-12 (5th Cir. 2011) (holding that any ex post facto violation in applying an amended guideline is not plain error because *Castillo-Estevez* controls).[2]

## B. Amount of Loss

The district court calculated Murray's guidelines range using $84 million as the amount of loss. Murray challenges the methodology the district court used to arrive at that amount and also argues that the amount of loss should have been adjusted downward to account for economic conditions beyond his control. We review factual determinations in determining the loss amount for clear error, *United States v. Setser*, 568 F.3d 482, 496 (5th Cir. 2009), but to the extent the district court's methodology for calculating losses involves an application of the guidelines, we review such legal conclusions de novo. *United States v. Goss*, 549 F.3d 1013, 1016 (5th Cir. 2008).

Under U.S.S.G. § 2B1.1, the guidelines range calculation for the amount of loss is based upon the amount of financial loss to the victims, here, the investors. The amount of loss is to be the greater of actual or intended loss. U.S.S.G. § 2B1.1 app. n.2(A). In this case, we are dealing with the actual loss, which is the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 app. n.2(A)(i).

*1. The District Court's Methodology*

---

[2] Murray argues that, post-*Booker*, this circuit has held that applying new guidelines to offenses predating the effective date violates the ex post facto clause. *See United States v. Austin*, 479 F.3d 363, 367 (5th Cir. 2007); *United States v. Reasor*, 418 F.3d 466, 479 (5th Cir. 2005). However, *Castillo-Estevez* distinguished those cases and clearly established that there is currently a "reasonable dispute" on the issue, preventing a defendant from establishing plain error. 597 F.3d at 241 n.1.

No. 09-20813

The PSR used the amount of outstanding loans at bankruptcy, $165 million, as the amount of loss. Murray objected to the PSR, arguing that he should receive credit for the value of the collateral securing the loans. He argued that, where the defendant has pledged or "otherwise provided" collateral, the guidelines advise courts to reduce the loss by "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." U.S.S.G. § 2B1.1 app. n.2(E)(ii).

At sentencing, the district court was originally prepared to accept the PSR's loss determination. However, after significant discussion between the court and Murray's counsel, the Government suggested that the court use the loss amount of $84 million that was supported by the trial testimony of Dennis Arnie, a Certified Public Accountant who studied the Premiere accounts extensively. He testified that the losses already realized at the time of trial were $67.1 million, which accounted for the $50 million that the investors recovered from the collateral and from the loans. He testified that another $17 million would never be recovered, bringing the total loss figure to $84 million.[3] In light of the Government's concession, the district court decided to adopt $84 million as the amount of loss.

*2. Legal Analysis of the Methodology*

---

[3] Arnie testified as follows:

The total loss from the Presidential Partnerships realized to-date was $54,579,878. Additional losses which will likely be incurred of 17,570,512. So, from Presidential Partnerships, a little bit in excess of 84 million.

From the ones Mr. Lapin worked himself, a little over 5.4 million. And there were some other, four or five, miscellaneous loans of 7 million. So, the total losses, summary of investor losses, is 67,198,000–a little over 67 million – realized– I'm sorry. $67,198,134 realized losses. 17,570,512 of losses that, from an accounting standpoint, would be recognized as losses. So, total losses between the two categories of a little in excess of $84 million.

No. 09-20813

According to Murray, the "true losses" were only $28 million.  He bases that claim on a statement in the PSR stating that the "fixed losses" were $28 million.  But the PSR does not explain what is meant by this term or how the probation officer arrived at this figure.  We reject this argument because no correlation is shown between this figure and the total losses to the victims.

Murray maintains his original objections to the $165 million figure, which he argues informed the court's reasoning in reaching the $84 million figure.  He also argues that the $84 million  figure accounts for the value of the outstanding loans and the "amount deemed unrecoverable" but fails to account for the value of the collateral that was undisposed of at the time of sentencing.

In *United States v. Goss*, a mortgage fraud case, we determined that the actual loss was determined by deducting the value of the collateral from the total loan amounts.  549 F.3d at 1017-18.  *Goss* supports the use of the total amount of outstanding loans ($165 million) as the starting point from which the value of collateral is then deducted.  *See id.*  We do not read Arnie's testimony as estimating likely losses without considering the value of the unsold collateral. We understand his testimony to mean that, starting with the outstanding loan amount of $165 million, then deducting from that figure the amount actually recovered by the victims together with the amount Arnie estimated they could recover on the remaining collateral, the investors would suffer $84 million in total losses.

The  record  makes  it  clear  that  Arnie  had  studied  Premiere's  loans extensively, and his testimony summarizing the losses was based on voluminous exhibits explaining in detail how he arrived at his conclusion.  Although these exhibits are not in the record, Murray had the right to fully cross-examine Arnie about all of them.  The district court was entitled to rely on Arnie's expert testimony, included in the PSR Addendum, that the victims' losses amounted to $84 million.  Murray presented no evidence, expert or otherwise, tending to

refute Arnie's testimony. *See United States v. Rome*, 207 F.3d 251, 254 (5th Cir. 2000) ("If a defendant presents no rebuttal evidence, the facts contained in the PSR may be adopted without further inquiry so long as the facts rest on an adequate evidentiary basis.").

As we stated in *Goss,* a district court need only make a reasonable estimate of loss, and, "because the sentencing judge is in a unique position to assess the evidence and estimate the loss . . . the court's loss determination is entitled to appropriate deference." *Id.* at 1019 (internal quotation and citation omitted). We find that the district court made a reasonable estimate of the total loss and correctly applied the guidelines.[4]

*3. External Factors*

Murray also argues that the total loss amount should be discounted to account for the decreased value of the collateral resulting from external market factors. The Government argues that the losses were not caused by the 9-11 attack or other external factors, but rather were caused by the company's inability to generate funds from new investors, which ultimately precipitated the collapse of the Ponzi scheme. In response, Murray argues that the program was not a Ponzi scheme because it had actual investments that were affected by market factors. Ponzi schemes, he argues, are entirely fraudulent and do not have assets.

Murray defines "Ponzi scheme" too narrowly. "The term [Ponzi scheme] has come to be used to describe a scheme whereby the swindler uses money from later victims to pay earlier victims." *Guidry v. Bank of LaPlace*, 954 F.2d 278, 280 n.1 (5th Cir. 1992); *see also Janvey v. Alguire*, 2011 WL 2937949 (5th Cir. 2011). Therefore, the existence of assets does not prevent the conspiracy from

---

[4] Even if the district court accepted Murray's argument that the amount of loss was $28 million, his guidelines range would have been 292 to 365 months, well above his 240-month sentence.

amounting to what the district court and the PSR characterized as a Ponzi scheme.

We held in *United States v. Olis*, a securities fraud case, that the district court erred in computing the actual loss because it failed to consider extrinsic factors that caused some of the decline in the value of stock.  429 F.3d 540, 548-549 (5th Cir. 2005).  However, the guidelines do not require sentencing courts to consider extrinsic factors that affect the value of collateral when using the collateral to discount the amount of loss.  The loss should be discounted by the fair market value of collateral, not by the value the collateral could have had in better economic conditions.  *See* U.S.S.G. § 2B1.1 app. n.2(E)(ii).  We therefore find that the district court correctly refused to estimate the collateral's value under different market conditions.

### C.  Murray as a Leader or Organizer

Murray contends that the district court misapplied the sentencing guidelines by applying § 3B1.1(a)'s four-level enhancement to his offense level based on his "leader/organizer" role.  Because Murray did not raise an objection in the court below, we review the district court's determination that he was a leader or organizer for plain error.  *Castillo-Estevez*, 597 F.3d at 240.

A defendant "must have been the organizer or leader of at least one other participant" to qualify as a leader/organizer.  *United States v. Ronning*, 47 F.3d 710, 712 (5th Cir. 1995).  In assessing a defendant's role as a leader/organizer, the Sentencing Guidelines direct a court to consider: (1) the defendant's exercise of decision making authority, (2) the nature of the defendant's participation in the commission of the offense, (3) the defendant's claimed right to a larger share of the fruits of the offense, (4) the defendant's degree of participation in the planning or organizing of the offense, (5) the nature and scope of the illegal activity, and (6) the degree of control and authority exercised by the defendant over others.  U.S.S.G. § 3B1.1 app. n.4.

Murray argues that he does not qualify as a leader/organizer because he did not exercise control over either of his codefendants. According to Murray, he and Lapin were functional equals in the company, but only Lapin could qualify as a leader because he alone supervised Wiggington. Lapin and Murray operated separate "spheres" of Premiere. Lapin ran the investor services subsidiary (Lapin & Wigginton) and Murray ran the mortgage subsidiary (Money Mortgage). Furthermore, Murray argued that it was Lapin's idea to create Premiere out of their previously separate companies.

The Government need not produce direct evidence demonstrating that Murray directed or controlled other participants. *See United States v. Barnett*, 273 F.3d 1094, *4 (5th Cir. 2001) (unpublished) (noting that although no direct evidence precisely established that the defendant directed or controlled other participants, the evidence did give a strong inference to that effect). However, a district court may infer from available facts, including circumstantial evidence, that a defendant exercised a leader/organizer role. *See United States v. Cabrera*, 288 F.3d 163, 174 (5th Cir. 2002) (finding that the evidence provided an adequate basis for the inference that defendants were leaders/organizers in light of the U.S.S.G. § 3B1.1 app. n.4 factors).

Although Murray ran the "mortgage side" of the scheme while Lapin ran the "investor side" with Wiggington working under him, evidence supports the inference that Murray had a degree of control over the other participants because the two sides of the business were not completely independent as Murray contends. Murray was the President and CEO of Premiere; he had a right to the largest share of the profits. He ran weekly meetings that Lapin and Wigginton attended, which suggests coordination between the investment and mortgage sides of the operation. In at least one instance, Lapin's "investment" side of the firm compiled packets as instructed by Murray for one of Murray's "mortgage side" meetings, suggesting that Lapin's side of the operation was

No. 09-20813

answerable to Murray.  We therefore find that the district court committed no plain error in applying the leader/organizer four-level enhancement.

### D. Substantive Reasonableness

Murray asserts that his 240-month sentence, which is 120 months below the low end of his guidelines range, is substantively unreasonable because it is greater than necessary to effect the purposes of sentencing.  *See* 18 U.S.C. § 3553(a) (advising sentencing courts to "impose a sentence sufficient, but not greater than necessary to comply with the specific purposes" of 18 U.S.C. § 3553(a)(2)).  He argues that the guidelines create an artificially high starting point for sentencing that over-punishes securities fraud because the enhancement  factors are inherent in any large-scale securities fraud and lack empirical grounds.  He also argues that the sentence resulted in sentencing disparity between himself and his coconspirators (Lapin and Wigginton received three-year sentences following their guilty pleas) and punished him at the same level as defendants convicted of multibillion dollar frauds.

Murray raised the same arguments at sentencing when he argued for a below-guidelines sentence.  The district court took his arguments into account when it articulated its reasons for the below-guidelines sentence according to the § 3553(a) factors.  The court explained the seriousness of Murray's offense and noted that the factors did not necessarily weigh in favor of a below-guidelines sentence.  For example, Murray could have received a total sentence of as long as 1,572 months.  The court noted that the monetary loss understated the harm caused by Murray's crimes in some respects because the victims had also suffered "physically, mentally, [and] emotionally," some losing their life savings. The district judge stated that Murray's actions were "pathological," and that he was "arrogant and unremorseful and unrepentant for the harm that he has caused to numerous—over 500 victims in this case."  Rejecting Murray's contention that he should be sentenced more leniently because he was a white-

10

collar criminal, the district court noted that "the astounding loss amount caused by this complex scheme that was headed by this defendant, organized by this defendant, masterminded by this defendant, has [a] far-reaching impact on hundreds of victims."

The district court considered the more lenient sentences received by Lapin and Wigginton and, based in part on that consideration, concluded that a 30-year sentence was greater than necessary to meet the sentencing objectives and to sanction Murray's conduct, given his age and health.  The court determined that a below-guidelines, 240-month sentence accounted for this factor as well as any overlap between the various guidelines enhancements.

We traditionally entrust sentencing "to the discretion of district courts, [which are] close to the ground and more cognizant of the details of [the] offender and offense that should be determinative of [the] sentence." *United States v. Duarte*, 569 F.3d 528, 531 (5th Cir. 2009).  We find that the sentencing court imposed a substantively reasonable sentence and did not abuse its discretion. *See United States v. Goodman*, 307 F. App'x 811, 812 (5th Cir. 2009) (unpublished) (holding that a below-guidelines sentence afforded a rebuttable presumption of reasonableness).

### III. Conclusion

For the reasons stated above, we AFFIRM Murray's sentence.