# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-50465

United States Court of Appeals
Fifth Circuit

**FILED**
June 29, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

RICARDO LOPEZ,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 2:16-CR-135-1

Before KING, GRAVES, and OLDHAM, Circuit Judges.

PER CURIAM:*

The defendant was convicted of taking a bribe and engaging in other corrupt activity while serving as the mayor of a small city. On appeal, he does not contest his guilt but argues that the amount of restitution ordered was too high, his sentence too long, and his conditions of supervised release too onerous. We affirm the judgment of the district court in all respects.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-50465

## I.

## A.

In 2015, gambling entrepreneur Ngoc Tri Nguyen set his sights on Crystal City, Texas, looking for a new location to run an illegal "eight-liner" gambling operation.[1] He found a place to rent, and as luck would have it, his landlord was Crystal City's mayor, defendant Ricardo Lopez. Nguyen soon sought to expand the building in order to fit more machines, and Lopez suggested that Nguyen buy the building from him. Lopez and Nguyen agreed to a cash price of $40,000. Unbeknownst to Nguyen, however, Lopez did not actually own the building. Lopez had been in talks with the building's true owner, a man named Harry Thompson, to buy it for $36,000, but the deal never materialized. Once Lopez agreed to "sell" the building to Nguyen, though, Lopez returned to Thompson with the news that he had found a buyer. Nguyen paid Lopez $40,000 in cash, Lopez paid Thompson $36,000 in cash, and Thompson transferred title to Nguyen.

This marked the beginning of a fruitful relationship for Lopez and Nguyen. Lopez took Nguyen's gambling operation under his wing, helping him pass electrical inspections, keeping him out of trouble with the law, and even renaming the street leading to Nguyen's building after Nguyen's son. At the same time, James Jonas, the city manager and city attorney, had the police shut down a rival eight-liner operation.

Soon Lopez was negotiating with another property owner, Titakudi Natarajan, on Nguyen's behalf. Nguyen had promised Lopez that, if all went well, he could run a restaurant that Nguyen was planning to build. The price that Natarajan quoted was outside Nguyen's price range, however, so Lopez

---

[1] An eight-liner is an electronic gambling machine, similar to a slot machine. Eight-liners that pay out cash are generally illegal in Texas.

No. 18-50465

proposed that Nguyen could get a loan from the city, which the city would then forgive, in order to afford the property.

At another point, Lopez approached Nguyen and asked for a $6000 loan, to buy a new car. Nguyen loaned him the money. Subsequently, Nguyen proposed to Lopez that he would forgive the loan if the city would waive around $4000 in taxes that Nguyen had coming due. Lopez agreed, and Jonas had the city's finance director waive Nguyen's taxes.

Ultimately, the government indicted Lopez, Jonas, Nguyen, and three city councilmembers, Rogelio Mata, Roel Mata, and Gilbert Urrabazo, for conspiring to commit federal-programs bribery. Only Lopez and Jonas went to trial. The two men were eventually charged with conspiring to commit federal-programs bribery, under 18 U.S.C. §§ 371, 666(a)(1)(B), and conspiring to commit wire fraud involving theft of honest services, under 18 U.S.C. §§ 1343, 1346, 1349, all in connection with their dealings with Nguyen as well as two other corrupt schemes that principally involved Jonas.[2] Lopez was also charged with a substantive count of bribery for accepting forgiveness of Nguyen's $6000 loan and substantive counts of wire fraud in connection with the Natarajan property deal. The jury found Lopez guilty on all counts.

## B.

### 1.

After the trial, Lopez sought to be released on bond pending sentencing. His counsel argued that Lopez had been prescribed painkillers for his recent back surgery but was only able to obtain ibuprofen while incarcerated. Counsel provided copies of the prescriptions to the district court, but the court became

---

[2] In one of those other schemes, Jonas was charged with soliciting and facilitating bribes from a city contractor to himself and the councilmembers. Although Lopez was not accused of taking any bribes from the contractor, he was accused of voting to award him a contract in furtherance of the conspiracy.

troubled that Lopez had received three hydrocodone prescriptions, from three different doctors, in the span of one month, including two on the same day. The district court denied bond, stating that, "one of the things that bothers the Court [is] these multiple prescriptions that [Lopez] tries to use as a sign that he is in need of bond by multiple doctors for the same powerful drug, hydrocodone. Something's not right there."

At sentencing, the district court remarked that Lopez's presentence investigation report (PSR) said nothing about the prescriptions that Lopez had provided at the bond hearing.[3] The district court explained, "because it's an addictive substance I want to send him to drug aftercare and impose drug conditions." Lopez did not object. Among the conditions of his eventual supervised release, the district court ordered that Lopez "not knowingly purchase, possess, distribute, administer or otherwise use any psychoactive substances such as synthetic marijuana, bath salts, et cetera, that impair a person's physical or mental functioning, whether or not intended for human consumption."

**2.**

The PSR contained a letter from Santos Camarillo, Crystal City's new city manager. According to the letter, Lopez "defrauded the taxpayers of the City of Crystal City in the amount of $18,003.95." The letter explained that Lopez made "unnecessary and frivolous trips" at taxpayer expense and that his requests for reimbursement often had "little to no backup documentation." The letter stated that Jonas told the city's finance department to "just pay [Lopez]" because they "need to keep the Mayor happy." The letter noted in particular that Lopez spent $1220.80 on a trip to El Paso to see a recycling center, $535.05

---

[3] The district court originally misremembered and stated that Lopez's prescriptions had been for oxycodone. The prosecutor noted that they were actually for Vicodin (which contains hydrocodone).

No. 18-50465

on a trip to Houston for the lunar new year, and $571.54 attending a conference for lawyers, despite not being a lawyer himself. The letter also described other occasions on which Lopez allegedly misspent funds, but it did not contain any other specific dollar amounts.

At sentencing, Lopez objected both to the total amount and to the characterization of these expenses as "frivolous and unnecessary," and he subpoenaed Camarillo to testify. Camarillo testified that she totaled up and reviewed all of Lopez's expenses and concluded that "every single expenditure" was "frivolous and unnecessary." With regard to the trip to El Paso, she opined that "[i]t was frivolous because [Lopez] didn't have to go as far as El Paso" to see a recycling center. And she stated that the expenses relating to the conference were frivolous because they included "$78 for laundry" as well as "many" minibar expenses. Lopez presented no evidence to rebut Camarillo's testimony, and the district court thus overruled his objection, finding there to be "reasonable and reliable and credible evidence" that Lopez should have to repay $18,003.95 to the city. The district court thus imposed a restitution order of $24,003.95, consisting of the amount just discussed plus $6000 for Nguyen's waived taxes.[4]

**3.**

The PSR also stated that Lopez should be held responsible for an intended loss to the city of between $15,000 and $40,000. The probation office arrived at this amount by summing (i) $11,291.73, the total amount of bribes that Lopez's coconspirators had received, and (ii) $6000, the amount that Nguyen paid Lopez.[5] At sentencing, Lopez objected to the $11,291.73, on the

---

[4] Although Nguyen testified at trial that he owed $4000 in taxes, the PSR stated that, "[a]t the time, Nguyen estimated these assessments to be equal to the $6,000 that Lopez owed him."

[5] The PSR also included an additional $1000, relating to a kickback that the government alleged Urrabazo intended to pay Lopez as part of the Natarajan property deal.

ground that he was unaware of and did not profit from those bribes. The district court overruled the objection, on the basis that Lopez was in a conspiracy with the individuals who did receive the bribes. Accordingly, Lopez was held responsible for a loss of $17,291.73, which raised his offense level by four under the sentencing guidelines. *See* U.S. Sentencing Guidelines Manual §§ 2B1.1(b)(1)(C), 2C1.1(b)(2) (U.S. Sentencing Comm'n 2018).

The PSR indicated that Lopez's offense level should be increased by an additional four because he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." *See id.* § 3B1.1(a). Lopez objected to this enhancement as well, on the basis that he had "little or no control over" his coconspirators and that, in fact, Jonas and Rogelio and Roel Mata had a "much more substantial leadership role." The district court overruled this objection, stating that, based on the evidence at trial, "Lopez was very much involved in terms of giving instructions of how items and matters and monies were to be used; and how people were to be dealt with . . . ; and making sure that people on the city council . . . [and Jonas] were being taken care of."

Accordingly, Lopez's guideline sentencing range was 78-97 months, and the district court sentenced him to 97 months' imprisonment. This appeal followed.

## II.

### A.

We review "the legality of a restitution order de novo and the amount of the restitution order for an abuse of discretion." *United States v. Arledge*, 553 F.3d 881, 897 (5th Cir. 2008). And we review the district court's factual findings

---

Lopez objected, on the ground that the kickback was never paid, and the district court sustained the objection.

underlying the restitution order for clear error. *See United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012). The government bears the burden of demonstrating the amount that the victim lost. *See* 18 U.S.C. § 3664(e). "[E]xcessive restitution awards cannot be excused by harmless error; every dollar must be supported by record evidence." *Sharma*, 703 F.3d at 323.

Lopez argues that the restitution order was invalid because the government did not provide an evidentiary foundation for the entirety of the $18,003.95 claimed by Camarillo and because Camarillo's testimony was unreliable.[6]

There is no evidence in the record detailing the dollar amounts of each of Lopez's "frivolous and unnecessary" expenditures as mayor. But the district court did have sworn testimony from Camarillo that Lopez inappropriately charged the city $18,003.95. Although Lopez attempted to impeach Camarillo's credibility,[7] the district court was entitled to, and evidently did, credit her testimony. And Lopez had no contrary evidence of his own. This case is thus unlike *United States v. Desouza*, 630 F. App'x 339 (5th Cir. 2016) (per curiam), in which "no evidence was cited" to support the total restitution amount. *Id.* at 340. The district court's finding that the $18,003.95 was not in furtherance of city business was not clearly erroneous, and thus the restitution order was not an abuse of discretion.[8]

---

[6] Lopez does not argue that the facts found by the district court are legally insufficient to support the restitution order, so we do not address that question. *Cf. Arledge*, 553 F.3d at 897.

[7] For example, with respect to the trip to El Paso, Camarillo acknowledged that she did not know for certain where a closer recycling center was but "assum[ed] that Eagle Pass has a good one" and that "probably Del Rio has one, too."

[8] Lopez makes no argument relating to the $6000 component of the restitution order.

No. 18-50465

## B.

Lopez next argues that the district court erred in calculating his guideline sentencing range, in that the increases to his offense level based on the loss amount and his purported leadership role were erroneous. We review the district court's interpretation and application of the sentencing guidelines de novo and its underlying factual findings for clear error. *See United States v. Harris*, 597 F.3d 242, 250 (5th Cir. 2010).

## 1.

"Under the Sentencing Guidelines, the offense level for offenses involving fraud is increased based on the amount of the loss inflicted by the defendant." *Id.* at 249. "In calculating the amount of loss for purposes of the enhancement, the district court 'need only make a reasonable estimate of the loss.'" *United States v. Bazemore*, 839 F.3d 379, 387 (5th Cir. 2016) (quoting U.S. Sentencing Guidelines Manual, *supra*, § 2B1.1 cmt. n.3(C)). Additionally, the offense level "is determined on the basis of all 'relevant conduct' in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction." *United States v. Morrow*, 177 F.3d 272, 301 (5th Cir. 1999). "Relevant conduct" includes "all reasonably foreseeable acts and omissions of others in furtherance of . . . jointly undertaken criminal activity." *Id.* at 301-02.

As noted above, Lopez's guideline sentencing range was calculated based on a loss of $17,291.73—of which $6000 related to the forgiven loan from Nguyen and the rest related to bribes paid to Lopez's coconspirators. On appeal, however, Lopez merely reiterates his arguments about the lack of itemization of the evidence supporting the $24,003.95 restitution order. Because he raises no argument about the actual basis for the district court's loss calculation, he fails to demonstrate any error by the district court.

## 2.

The sentencing guidelines provide for a four-level enhancement in cases where "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S. Sentencing Guideline Manual, *supra*, § 3B1.1(a). Alternatively, if the defendant "was a manager or supervisor (but not an organizer or leader)" of such an activity, then the guidelines provide for a three-level enhancement. *Id.* § 3B1.1(b). "A defendant 'must have been the organizer or leader of at least one other participant' to qualify as a leader/organizer," *United States v. Murray*, 648 F.3d 251, 256 (5th Cir. 2011) (citation omitted), and more than one participant may be classified as a leader or organizer, *see United States v. Rodriguez*, 897 F.2d 1324, 1327 (5th Cir. 1990).

> In assessing a defendant's role as a leader/organizer, the Sentencing Guidelines direct a court to consider: (1) the defendant's exercise of decision making authority, (2) the nature of the defendant's participation in the commission of the offense, (3) the defendant's claimed right to a larger share of the fruits of the offense, (4) the defendant's degree of participation in the planning or organizing of the offense, (5) the nature and scope of the illegal activity, and (6) the degree of control and authority exercised by the defendant over others.

*Murray*, 648 F.3d at 256.

Lopez argues that he was not a leader or organizer of the conspiracy because he did not join it until it was already underway and his coconspirators did not consider his participation integral. And he argues that he had no control over his coconspirators and that Jonas, Rogelio Mata, and Roel Mata received most of the profits. Moreover, although he was the mayor of the city, Lopez observes that he had just a single vote on the city council and had no other authority over the council's activity. Thus he argues that, at most, he should have received a three-level enhancement for being a manager or

supervisor. The government responds that Lopez served as a leader or organizer of the scheme involving Nguyen, at least, even if not other aspects of the conspiracy.

Evidence in the record supports the district court's conclusion that Lopez was a leader or organizer. To be sure, Lopez was not *the* top man in the conspiracy, but that is not dispositive. *See, e.g.*, *United States v. Cooper*, 274 F.3d 230, 247 (5th Cir. 2001). There was evidence at trial that Lopez directed Jonas to rename the street for Nguyen's son, that Lopez had Jonas protect Nguyen from the electrical inspector, and that Lopez directed Jonas to help Nguyen obtain a business license. Indeed, Nguyen testified that Lopez told him that he "controlled" both Jonas and the city itself. Moreover, according to the PSR, Lopez received more in bribes than any other conspirator but Jonas. Considering the foregoing, the district court's finding that Lopez was a leader or organizer was "plausible in light of the record as a whole" and thus was not clearly erroneous. *United States v. Lage*, 183 F.3d 374, 383 (5th Cir. 1999).

## C.

Finally, Lopez argues that the condition of supervised release banning him from possessing or using "any psychoactive substance" was improper because it is vague, unduly severe, and lacks any relationship to him or to his offense.

In crafting an order of supervised release, a district court may impose conditions only if they are "reasonably related" to:

> (1) the nature and characteristics of the offense and the history and characteristics of the defendant, (2) the deterrence of criminal conduct, (3) the protection of the public from further crimes of the defendant, [or] (4) the provision of needed educational or vocational training, medical care, or other correctional treatment to the defendant.

*United States v. Weatherton*, 567 F.3d 149, 153 (5th Cir. 2009). Additionally, the conditions imposed may not "involve a 'greater deprivation of liberty than is reasonably necessary for the purposes' of the last three [of those] factors." *United States v. Daniel*, 933 F.3d 370, 382-83 (5th Cir. 2019) (quoting 18 U.S.C. § 3583(d)(2)).

Because Lopez did not object below, we review his challenge for plain error. *Id.* Accordingly, he must show a "clear or obvious" error that affected his "substantial rights." *Id.* at 382 (quoting *United States v. Smith*, 878 F.3d 498, 503 (5th Cir. 2017)). If he does, we will correct the error only if "it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *United States v. Figueroa-Coello*, 920 F.3d 260, 264 (5th Cir. 2019)).

The gravamen of Lopez's argument is that "[v]arious innocuous foods, vitamins, and beverages," such as "coffee, cigarettes, sugar, over-the-counter allergy medicine, sleeping pills, certain herbal supplements, [and] chocolate," could be classified as "psychoactive substances." In *Daniel*, however, this court confronted a similar challenge to a substantially identical condition of supervised release; the only meaningful difference was that the condition in that case made an exception for conduct done "with the prior approval of the probation officer." *Id.* at 376. Rejecting the defendant's argument that the special condition was "vague and overbroad," this court observed that "[t]he condition's plain language gives explicit examples of substances the court meant"—i.e., synthetic marijuana and so-called bath salts—and noted that the condition was "further narrowed . . . to only those psychoactive substances 'that impair a person's physical or mental functioning.'" *Id.* at 383. And the court remarked that if the defendant were "confused about what the special condition encompasses, she would be free to contact her probation officer to inquire about the propriety of specific substances or to get permission for prohibited substances." *Id.* at 383-84.

To be sure, Lopez's condition does not contain the same carveout for substances taken with prior permission. But we do not believe that the absence of this language transforms the special condition from one that is not error at all, *see id.* at 383, to one that is clear or obvious error. Indeed, although the ability to obtain an exemption from the condition may alleviate its severity, it does nothing to make the condition less vague. And for the reasons expressed by the court in *Daniel*, *see id.*, we do not understand Lopez's condition of supervised release to prohibit his consumption of any of the items listed in his parade of innocuous substances.

Lopez observes that, in *United States v. Colson*, 675 F. App'x 624 (7th Cir. 2017), the Seventh Circuit suggested that a condition of supervised release prohibiting consumption of "psychoactive substances" would include "sleeping pills, certain herbal supplements, and other legal substances." *Id.* at 627-28. But there the Seventh Circuit was "literally" interpreting the term "psychoactive substances," *id.*, not construing the language presented in this case, which limits the special condition to substances "that impair a person's physical and mental functioning" and are in some way akin to "synthetic marijuana" and "bath salts."

Lopez also argues that the special condition is unrelated to his offenses or his personal circumstances. But as the district court made clear at sentencing, it imposed this condition out of concern that Lopez was abusing—or at risk of abusing—prescription painkillers. The condition is thus "at least reasonably related" to Lopez's "history and characteristics." *Daniel*, 933 F.3d at 384. Lopez has not demonstrated that the imposition of this special condition was clear or obvious error.

### III.

For the foregoing reasons, we AFFIRM the judgment of the district court.