# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
June 2, 2026

Lyle W. Cayce
Clerk

No. 25-50144

United States of America,

*Plaintiff—Appellee*,

*versus*

Allen Houston James,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 6:21-CR-106-1

Before Willett, Wilson, and Douglas, *Circuit Judges*.
Don R. Willett, *Circuit Judge*:

In June 2000, an unknown assailant entered M.M.'s barracks room at Fort Hood, sexually assaulted her, and stabbed her again and again—twice in the neck, missing major blood vessels by mere millimeters.[1] The investigation soon went cold. Nearly two decades later, forensic genealogy revived it. DNA from semen found on M.M.'s mattress cover led

---

[1] Out of respect for the victim's privacy, we use only her initials.

No. 25-50144

investigators first to a close genetic relative of the attacker, and then to Allen James.

A jury convicted James of attempted murder,[2] and the district court sentenced him to 200 months' imprisonment and three years of supervised release. James now raises three arguments: (1) the evidence did not prove an intent to kill, (2) the jury instructions failed to require such an intent, and (3) the district court violated the Ex Post Facto Clause[3] by using the Sentencing Guidelines in effect at sentencing rather than those in effect when the crime occurred.

Only the last argument succeeds. A rational jury could find that James intended to kill M.M., and James cannot obtain reversal based on instructional language he materially requested. But, as the Government concedes, the district court plainly erred by applying a later Guidelines Manual that increased James's advisory range. We therefore AFFIRM the conviction, VACATE the sentence, and REMAND for resentencing.

## I. Background

### A. The Attack and Injuries

In June 2000, M.M. had been stationed at Fort Hood for just over a year. She lived in Room 230 in one of four barracks surrounding a grassy field. Sometime after 1:00 a.m. on June 18, she awoke to the sound of someone opening her unlocked door. A man was standing in the doorway. M.M. did not recognize him, but she later described him as "a tall light-skinned black man, [with] a bald head [and] a baby face." He wore black jeans and a white

---

[2] *See* 18 U.S.C. § 1113.

[3] U.S. Const. art. I, § 9, cl. 3 ("No . . . ex post facto Law shall be passed.").

tank top, and he appeared "maybe lost or confused," as though "under the effects of something."

M.M. pretended to be asleep. The man closed the door and walked to her bed. He pulled his jeans down to his knees, pulled the blanket off M.M., put one hand on each side of her head, and leaned in to kiss her. M.M. pushed him away. She asked who he was and where he lived. He answered that he lived in "Room 233 in these barracks." M.M. told him he was in the wrong room. As he stood, she saw a black knife with a short blade in his hand.

The man tried to remove M.M.'s pants. When he could not, he tried to cut them off with the knife. He then pulled her pants down to her ankles and tried to force himself on her. As M.M. fought back, he stabbed her twice in the left knee, forced her legs down, and climbed on top of her. He kept stabbing her. He also bit and hit her, including on the head. M.M. used her right hand to prevent penetration. The man responded by stabbing her again—twice in the right shoulder and in both wrists. One wound pierced entirely through her right wrist, impaling it on the nightstand.

The violence escalated. The man pressed the knife against M.M.'s throat and asked, "what is more important, your life or the p***y?" M.M. continued resisting. He again pressed the knife to her throat—this time hard enough to keep her from breathing—and repeated the threat. When she still resisted, he stabbed her twice in the neck. He continued stabbing even after she stopped resisting.

After the stabbing ended, the man knelt on the bed and began to masturbate. He tried to penetrate M.M. but was unable to do so. He then simulated intercourse by rubbing against her vagina. Before leaving, he tried unsuccessfully to cut the mattress cover off the bed.

Once M.M. realized he was gone, she counted to ten "very slowly" and made her way to the barracks' Charge of Quarters office. She reported that a black man from Room 233 had tried to rape her. Seeing M.M. covered in blood, the Charge of Quarters called 911. One responding EMT described her condition as "shocking"—"like something you would see in the movies or on TV."

M.M. was taken by ambulance to the hospital, where she underwent surgery. Doctors found lacerations to her arms, hands, fingers, knee, shoulder, upper chest, and neck. The wound to her right wrist had both an entrance and an exit wound, confirming that the knife had passed entirely through it. The wounds to her neck penetrated the carotid sheath—the tissue surrounding the carotid artery and jugular vein—and missed those major blood vessels by only "a couple millimeters." Had either vessel been pierced, M.M. would have bled out within minutes. The medical resident who treated her later testified that the case was "one of the few that stood out over [his] career" and that he had "never seen a victim with that many stab wounds before."

## B. Initial Investigation

When Army Criminal Investigation Division (CID) agents searched M.M.'s room, they found a fresh semen stain on the mattress cover. They collected a sperm sample from the stain. DNA from that sample was consistent with one of two contributors to the DNA obtained from M.M.'s hospital rape kit; M.M. was the other contributor.

Investigators compared that DNA sample against blood samples from more than thirty people. Every one was excluded as a potential contributor. This included the resident of Room 233 in M.M.'s barracks building, who also did not match M.M.'s description of her attacker.

The investigation eventually went cold.

## C. Subsequent Investigation

In 2019, CID Special Agent Matthew Walters was assigned to the case. That same year, he attended an FBI training seminar where Dr. Colleen Fitzpatrick presented on the forensic-genealogy company she had founded. "Forensic genealogy is law enforcement's use of DNA analysis combined with traditional genealogy research to generate investigative leads for unsolved violent crimes."[4] Forensic genetic genealogy, a related subfield, gained national prominence in 2018 when investigators used it to identify the Golden State Killer.[5] It works by comparing an unidentified DNA profile against consumer DNA data to identify potential genetic relatives.[6]

After the seminar, Agent Walters enlisted Dr. Fitzpatrick to assist with M.M.'s case. Dr. Fitzpatrick compared DNA markers from the mattress-cover sample with profiles in GEDmatch, a database containing DNA data uploaded from services such as AncestryDNA and 23andMe. The search produced a match to "a very close cousin" of the man whose DNA was found on the mattress cover. From there, Dr. Fitzpatrick's team identified four individuals with the correct degree of relationship to have potentially contributed the mattress-cover DNA. Agent Walters's own investigation identified three more.

Of those seven candidates, only one had any connection to Fort Hood at the time of the attack: Allen James. James was stationed at Fort Hood when M.M. was assaulted and lived in Room 233 of a nearby barracks building. He

---

[4] U.S. Dep't of Just., Interim Policy: Forensic Genetic Genealogical DNA Analysis and Searching 3 (2019), https://perma.cc/8HEB-2643.

[5] *See* Claire L. Glynn, *Bridging Disciplines to Form a New One: The Emergence of Forensic Genetic Genealogy*, 13 Genes 1381, at 1 (2022).

[6] *See generally id.*

also matched M.M.'s description of her attacker. CID agents had briefly interviewed James during the original canvass, but they never asked him for a blood sample.

In March 2021, CID agents interviewed James and collected a buccal swab. DNA from that swab matched the profile from the mattress cover, and James could not be excluded as a contributor to the sample from the rape-kit sample.

### D. Trial

A grand jury indicted James on one count of attempted murder. At trial, the only contested issue was identity: whether James was the man who attacked M.M. After three and a half hours of deliberation, the jury found James guilty.

### E. Sentencing

Before sentencing, the probation officer prepared a presentence report using the 2023 Guidelines Manual. The PSR calculated a Guidelines range of 210–262 months. Because attempted murder carries a 20-year statutory maximum, however,[7] the PSR recommended a range of 210–240 months.

That calculation rested on a base offense level of 33, based on the PSR's view that "the object of the offense would have constituted first degree murder" under a felony murder theory.[8] At sentencing, however, the district court rejected that theory and instead applied a base offense level of

---

[7] *See* 18 U.S.C. § 1113.

[8] *See* U.S.S.G. § 2A2.1(a)(1) (2023) (providing a base offense level for attempted murder of "33, if the object of the offense would have constituted first degree murder").

No. 25-50144

27,[9] producing a Guidelines range of 108–135 months. Like the PSR, the district court used the 2023 Guidelines Manual. Neither party objected. The district court ultimately varied upward and sentenced James to 200 months in prison.

## II. Discussion

James raises three arguments on appeal. First, he contends that the evidence was insufficient to prove a specific intent to kill. Second, he argues that the jury instructions allowed conviction without such a finding. Third, he maintains that the district court violated the Ex Post Facto Clause by applying the 2023 Guidelines Manual rather than the 1998 Manual, which was in effect when the offense occurred and would have produced a lower advisory range.

The first two arguments rest on the same legal premise: attempted murder requires a specific intent to kill. We therefore begin with that requirement before turning to James's sufficiency and instructional challenges. We then address his sentencing argument, which the Government concedes requires remand.

### A. The Specific-Intent Requirement

Criminal law ordinarily requires a culpable mind.[10] Under the federal murder statute, for example, a jury may convict only if the defendant acted with "malice aforethought."[11] But that phrase is misleading. It requires

---

[9] *See id.* § 2A2.1(a)(2) (providing a base offense level of 27 for all other attempted murders).

[10] *See United States v. Bailey*, 444 U.S. 394, 404 n.4 (1980) (explaining that "offenses where criminal liability is imposed in the absence of any *mens rea* whatsoever . . . are exceptions to the general rule that criminal liability requires an 'evil-meaning mind'").

[11] 18 U.S.C. § 1111(a).

"neither 'malice' nor 'forethought'"—at least "in the popular sense."[12] Rather, it is a term of art that "encompasses three distinct mental states: (1) intent to kill; (2) intent to do serious bodily injury; and (3) extreme recklessness and wanton disregard for human life."[13] Thus "a murder may be committed without an intent to kill."[14]

Attempted murder is different. Section 1113 makes it a crime to "attempt[] to commit murder," but does not define "attempt." Courts therefore look to the common law.[15] And at common law, attempt required "a *specific* intent to commit the unlawful act."[16] That specific-intent requirement often "goes beyond what is required for the completed offense," demanding specific intent even when a lesser mental state would suffice for the completed crime.[17] Attempted murder is one such offense: "[a]lthough a murder may be committed without an intent to kill, an *attempt* to commit murder requires a specific intent to kill."[18]

---

[12] Herbert Wechsler & Jerome Michael, *A Rationale of the Law of Homicide: I*, 37 COLUM. L. REV. 701, 707 (1937).

[13] *United States v. Hebert*, 813 F.3d 551, 560 n.5 (5th Cir. 2015) (citation omitted).

[14] *Braxton v. United States*, 500 U.S. 344, 351 n.* (1991) (citation omitted).

[15] *Id.*; *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 320–21 (2012) ("The age-old principle is that words undefined in a statute are to be interpreted and applied according to their common-law meanings. . . . Even though federal law has no common-law criminal offenses—all federal offenses having been created by statute—the federal courts still look to the common–law meaning." (footnote omitted)).

[16] *Braxton*, 500 U.S. at 351 n.* (emphasis added); *see also* 1 JENS DAVID OHLIN, WHARTON'S CRIMINAL LAW § 7:3 (16th ed. 2021); 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 11.3(a) (3d ed. 2017).

[17] 1 OHLIN, *supra*, § 7:3.

[18] *Braxton*, 500 U.S. at 351 n.* (emphasis added).

## B. Sufficiency of the Evidence

That rule frames James's sufficiency challenge. He contends that the Government failed to prove a specific intent to kill. The parties dispute whether he preserved that argument. We need not decide the point. Even under the more defendant-friendly standard, the evidence was sufficient.

Sufficiency review rests on two premises that pull in opposite directions. The first is that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."[19] That "standard of proof . . . 'plays a vital role in the American scheme of criminal procedure,' because it operates to give 'concrete substance' to the presumption of innocence to ensure against unjust convictions."[20] The second is that guilt is decided primarily by "the democratic branch of the judiciary"—that is, the jury—not by appellate judges.[21] The jury is the institution our system entrusts with weighing evidence, drawing inferences, and deciding whether the Government has carried its burden. Because "the people reserved the function of determining criminal guilt *to themselves*, sitting as jurors,"[22] a court must think twice before retrying the case on a paper record.

---

[19] *In re Winship*, 397 U.S. 358, 364 (1970). Although *Winship* interpreted the Due Process Clause of the Fourteenth Amendment, which by its terms applies only to the states, the same standard applies to federal criminal prosecutions under the Due Process Clause of the Fifth Amendment. *See, e.g.*, *Cool v. United States*, 409 U.S. 100, 104 (1972) (per curiam).

[20] *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (quoting *Winship*, 397 U.S. at 363).

[21] Essays by A Farmer, Essay IV (Mar. 21, 1788), *reprinted in* 5 THE COMPLETE ANTI-FEDERALIST 36, 38 (Herbert J. Storing ed., 1981) (emphasis omitted).

[22] *Neder v. United States*, 527 U.S. 1, 32 (1999) (SCALIA, J., concurring in part and dissenting in part) (emphasis in original).

*Jackson v. Virginia* reconciles those premises. A court may set aside a guilty verdict unsupported by proof beyond a reasonable doubt. But it may do so only when "the record evidence could [not] reasonably support a finding of guilt beyond a reasonable doubt."[23] The question is not whether *we* would have voted to convict.[24] "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[25]

That standard poses a high bar, though not an insurmountable one. A conviction cannot "rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference upon inference."[26] But "[w]e may not reweigh the evidence, or second-guess credibility choices that support the jury's verdict."[27]

James argues that the Government failed to prove that he intended to kill M.M. We disagree. He stresses the Government's proof of intent was limited to "[M.M.'s] description of the offense and the injuries she sustained."[28] But that is not a weakness in the proof. Intent is usually proved

---

[23] *See Jackson*, 443 US. at 318.

[24] *Id.* at 319.

[25] *Id.* (emphasis in original).

[26] *United States v. Waguespack*, 935 F.3d 322, 330 (5th Cir. 2019) (citation omitted).

[27] *United States v. Capistrano*, 74 F.4th 756, 768 (5th Cir. 2023) (cleaned up).

[28] *See United States v. Stoker*, 706 F.3d 643, 646 (5th Cir. 2013) (per curiam) ("Intent may, and generally must, be proven circumstantially." (quoting *United States v. Maggitt*, 784 F.2d 590, 593 (5th Cir. 1986)); *United States v. Tyler*, 505 F.2d 1329, 1332 (5th Cir. 1975) ("The element of intent must usually be proved by circumstantial evidence."); *United States v. Johnson*, 453 F.2d 1195, 1198 (5th Cir. 1972) ("Intent may be proved by circumstantial evidence. It rarely can be established by any other means. While witnesses may see and hear and thus be able to give direct evidence of what a defendant has done, there can be no eyewitness account of the state of mind with which the act was done.

circumstantially, because a defendant's state of mind is rarely announced aloud. Here, the circumstances allowed a rational jury to find intent to kill.

The attack itself permitted that inference.[29] Where an "attack was attended with great violence or brutality," intent to kill may be inferred even without a deadly weapon.[30] Here, there was both. James used a knife.[31] He used it repeatedly. And it was "used on 'a vital part' of [M.M.]'s body."[32] The inference is especially strong because James twice stabbed M.M. in the neck, penetrating the carotid sheath and missing major blood vessels by only a few millimeters. To be sure, as James notes, citing a Second Circuit case, "[t]he fact that a deadly weapon was used does not ipso facto prove the specific intent."[33] But it may support that inference, particularly when the weapon is used repeatedly and directed toward vital parts of the body.

M.M.'s injuries reinforce the point.[34] She suffered numerous stab wounds across her body—more than the treating medical resident had seen

---

But what a defendant has done or failed to do may indicate intent or lack of intent to commit the crime charged."); 2 LaFave, *supra*, § 14.2(b) ("One who intentionally kills another does not often announce to bystanders, 'I have in my mind an intent to kill' at the moment, or just before or after, he kills. . . . Obviously this intent must be gathered from all the circumstances of the killing—the killer's actions and his words (if any) in the light of the surrounding circumstances.").

[29] *See* 1 Ohlin, *supra*, § 21:3.; 2 LaFave, *supra*, § 14:2(b).

[30] 1 Ohlin, *supra*, § 21:3; *see also Smith v. Bradshaw*, 591 F.3d 517, 524 (6th Cir. 2010) ("[C]ase law reflects the sensible view that, as a general matter, repeated violent conduct conclusively proves intent to kill.").

[31] *United States v. Rios*, 830 F.3d 403, 441–42 (6th Cir. 2016) (holding that "[s]pecific intent to kill may be inferred" from a "brutal assault with a knife"); 1 Ohlin, *supra*, § 21:3.; 2 LaFave, *supra*, § 14:2(b).

[32] *See* 2 LaFave, *supra*, § 14:2(b) (footnote omitted).

[33] *See United States v. Kwong*, 14 F.3d 189, 194 (2d Cir. 1994).

[34] *See Williams v. Estelle*, 500 F.2d 206, 211 (5th Cir. 1974) ("Another source of evidence of malice and intent to kill is the extent of [the victim's] injuries."), *rev'd on other*

No. 25-50144

in any other case in his career. One wound pierced her carotid sheath and missed major blood vessels by mere millimeters. James also twice threatened M.M.'s life while pressing the knife to her throat. A rational jury could take those words seriously—especially because he then kept stabbing.[35]

James responds that all this evidence shows only an intent to rape, not an intent to kill. That argument fails for a simple reason: the two intents are not mutually exclusive. The jury could rationally find that James intended both to rape M.M. *and* to kill her.[36] Nor did the jury have to view the stabbing as merely a means of overcoming resistance. M.M. testified that James continued stabbing her even after she stopped resisting. And even if another jury could have drawn a different inference, this jury was not required to do so. To be sufficient, "[t]he evidence need not exclude every reasonable hypothesis of innocence"[37] or "be wholly inconsistent with every conclusion

---

*grounds*, 425 U.S. 501 (1976); *Wilson v. Sirmons*, 536 F.3d 1064, 1115 (10th Cir. 2008) (holding that photographs "depicting the extent of the injuries, are probative of the attacker's intent to kill"); *United States v. Penass*, 997 F.2d 1227, 1230 (7th Cir. 1993) (finding that the "character of the injuries" the victim suffered was probative of intent); *Patton v. Mullin*, 425 F.3d 788, 820 (10th Cir. 2005) (Briscoe, J., concurring) ("The nature and extent of [the victim's] injuries, viewed alone, strongly suggests that [the defendant] intended to kill her.").

[35] *See Gray v. Bowersox*, 281 F.3d 749, 753 (8th Cir. 2002) ("He twice threatened to kill [the victim], which shows murderous intent."); *Tillman v. State*, 325 N.E.2d 509, 564 (Ind. Ct. App. 1975) ("Evidence of a defendant's clear and unequivocal threats against the life of his victim during the course of an assault and battery is sufficient to sustain a finding that the defendant acted with the intent to kill.").

[36] *Cf. Colley v. Sumner*, 784 F.2d 984, 989 (9th Cir. 1986) ("The record demonstrates that a reasonable jury could have inferred from the evidence adduced at trial—particularly the evidence that [the defendant] undressed the victim after announcing his intent to kill her—that in stabbing her he intended both to subdue her for purposes of sexual assault *and* to kill her.").

[37] *United States v. Moreno*, 185 F.3d 465, 471 (5th Cir. 1999).

except that of guilt."[38] Rather, "the jury is free to choose among reasonable constructions of the evidence."[39] Based on the evidence here, the jury's construction—that James intended both to rape and to kill M.M.—was reasonable.

\* \* \*

In short, the jury had enough. Repeated stabbings, wounds to the neck, threats to life, and continued violence after resistance ceased permitted a rational finding that James intended to kill. His sufficiency challenge therefore fails.

## C. Jury Instructions

James's instructional challenge fares no better. The district court instructed the jury that it had to find beyond a reasonable doubt "[t]hat the defendant intended to commit murder." It explained that "the elements of murder . . . are: that a defendant unlawfully killed another human being; and that a defendant killed another human being with malice aforethought." It also explained "[t]o kill 'with malice aforethought' means either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life." James argues that, taken together, these instructions conveyed to the jury "that it could convict Mr. James if he intended to act with callous and wanton disregard for human life." But the instruction James now attacks was materially the instruction he requested. That ends the matter unless enforcing the invited-error doctrine would work a manifest injustice.

---

[38] *Id.*

[39] *Id.*

The invited-error doctrine embodies a basic rule of appellate litigation: "a defendant who asks for an instruction will not be heard to complain about the instruction on appeal."[40] That rule applies when the district court gives the requested instruction. It also applies when the instruction given is "substantially like" the one requested.[41]

That is what happened here. In every respect material to this appeal, James's proposed instruction matched the instruction the district court gave. Both told the jury that James had to intend to commit murder. Both defined murder to require "that the defendant unlawfully killed a person" and that he did so "with malice aforethought." And both defined malice aforethought to mean "either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life." If the district court's instruction misled the jury, it did so because of language James himself proposed.

James offers two responses. First, he argues that invited error requires waiver—that is, the "intentional relinquishment or abandonment of a known right."[42] Second, he argues that even invited error may be reviewed when necessary to prevent "manifest injustice."[43] Neither argument succeeds.

James's waiver argument has been embraced by some of our sister circuits.[44] But our precedent takes a different path. In *United States v.*

---

[40] *United States v. Gray*, 626 F.2d 494, 501 (5th Cir. 1980).

[41] *Dubose v. Kan. City S. Ry. Co.*, 729 F.2d 1026, 1033 n.4 (5th Cir. 1984) (citation omitted).

[42] *United States v. Olano*, 507 U.S. 725, 733 (1993) (citations omitted).

[43] *United States v. Salazar*, 751 F.3d 326, 332 (5th Cir. 2014).

[44] *See United States v. Long*, 997 F.3d 342, 353–54 (D.C. Cir. 2021); *United States v. Bastian*, 770 F.3d 212, 218 (2d Cir. 2014); *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (en banc).

*McCracken*, for example, we rejected a challenge to instructional language drawn from "several of the instructions proposed by defense counsel."[45] The defendant could not "now object," we explained, "to the use by the court of specific wording his own counsel used and proposed for inclusion in the instructions."[46] This case is analogous. James proposed the same materially defective language he now challenges. And although he says our invited-error cases involved knowing waiver, the cases he cites neither found nor discussed waiver.[47]

James cites *United States v. Olano*, which emphasized that "[w]aiver is different from forfeiture."[48] But *Olano* does not carry James as far as he needs to go. That case distinguishes waiver from forfeiture, but our cases recognize a third category: invited errors.[49] While "[w]aived errors are unreviewable" and forfeited errors are reviewed for plain error, invited errors are subject to a standard somewhere in-between: "manifest injustice."[50]

That distinction matters here. Mere forfeiture does not trigger the invited-error doctrine. As we have made clear, a defendant who simply fails to object—or even answers, "No, Your Honor" when asked whether he

---

[45] 488 F.2d 406, 421 (5th Cir. 1974).

[46] *Id.*; *see also United States v. Baytank (Hou.), Inc.*, 934 F.2d 599, 606–07 (5th Cir. 1991) (finding invited error where the defendant "not only failed to object to the allegedly overbroad portion of the court's charge, but that portion of the charge is the precise language requested by" the defendant);

[47] *See Gray*, 626 F.2d at 501; *United States v. Stanley*, 765 F.2d 1224, 1238 (5th Cir. 1985).

[48] *Olano*, 507 U.S. at 733.

[49] *See United States v. Rodriguez*, 602 F.3d 346, 350–51 (5th Cir. 2010).

[50] *Id.* (citations omitted).

objects to the court's proposed charge—has not necessarily invited error.[51] But a defendant who asks the district court to give the very instruction he later challenges stands differently. He has induced the court take the step he now says requires reversal.[52] James falls on the invited-error side of that line. He did not merely fail to object to the district court's proposed instruction. He proposed an instruction containing the same features he now attacks. Once he did so, he could avoid invited error only by "inform[ing] the court that he no longer seeks the challenged instruction."[53] He never did. The invited-error doctrine therefore applies.

James next argues that, even if he invited the error, reversal is still necessary to prevent manifest injustice.[54] We disagree for two reasons.

First, although the instruction may have been confusing, it is far from clear that the jury understood it to dispense with specific intent. The charge told the jury that James had to "intend[] to commit murder." It also explained that murder requires "kill[ing] another human being." To be sure, malice-aforethought language muddied the waters. But in all likelihood, a jury would have readily understood the instructions to require an intent to kill. The instruction was imperfect. But imperfection is not manifest injustice.

Second, even assuming the instruction misstated the law, we doubt James's claim that it "meant the difference between acquittal and conviction." As explained above, ample evidence supported the conclusion

---

[51] *United States v. Lerma*, 877 F.3d 628, 632–33 (5th Cir. 2017).

[52] *See Baytank*, 934 F.2d at 606–07; *McCracken*, 488 F.2d at 421.

[53] *Gray*, 626 F.2d at 501.

[54] *See Salazar*, 751 F.3d at 332.

that James intended to kill M.M. And the trial itself confirms the point. Identity—not intent—was the contested issue.

James says we should not hold that trial posture against him because the case was tried in the shadow of the proposed instruction. But the record does not support that account. Before the instructions were finalized, the Government had already rested, and James's counsel had told the court that the defense would call no witnesses. The instructions therefore did not cause James's failure to contest intent. James has not shown manifest injustice.

\* \* \*

The district court's *mens rea* instructions were not a model of clarity. Perhaps they were erroneous. Perhaps even plainly so. But they were materially the instructions James requested, and they did not produce a manifest injustice. They therefore do not require reversal.

## D. Ex Post Facto Clause

James's sentencing argument stands on different footing. The Ex Post Facto Clause forbids the Government from increasing punishment by laws with retroactive effect.[55] Such laws, the Framers recognized, "are contrary to the first principles of the social contract and to every principle of sound legislation."[56] A law violates that prohibition when it (1) "appl[ies] to events

---

[55] U.S. Const. art. I, § 9, cl. 3. Article I, Section 10 includes a similar clause that prohibits *states* from "pass[ing] any . . . ex post facto Law." *Id.* § 10, cl. 1. Because "the Supreme Court [has] made no distinction between" the two Ex Post Facto Clauses, *United States v. Seale*, 542 F.3d 1033, 1044 n.14 (5th Cir. 2008) (citing *Stogner v. California*, 539 U.S. 607 (2003)), *vacated on reh'g en banc*, 570 F.3d 650 (5th Cir. 2009) (mem.), we discuss cases involving both provisions interchangeably.

[56] The Federalist No. 44, at 282 (James Madison) (Clinton Rossiter ed., 1961).

occurring before its enactment," and (2) "disadvantage[s] the offender affected by it."[57]

James argues that the district court violated the Ex Post Facto Clause by using the 2023 Guidelines Manual (which was in effect at the time of the sentencing) rather than the 1998 Manual (which was in effect when the offense occurred and would have prescribed a lower Guidelines range). Because James did not preserve this argument, we review for plain error.[58]

Although the Guidelines are advisory,[59] *Peugh v. United States* holds that the Ex Post Facto Clause is violated "when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense."[60] That is this case. The 2023 Guidelines Manual (promulgated two-plus decades after the offense) produced a range of 108–135 months. The parties agree that the proper earlier Manual would have produced a range of 63–78 months.

The Government concedes that the district court plainly erred and that we should remand for resentencing. Under *Peugh*, using the later, harsher Guidelines was error. And after *Peugh*, that error is clear and obvious.[61] And because the later Guidelines "impos[ed] a significant risk of a

---

[57] *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (cleaned up).

[58] *See United States v. Kiekow*, 872 F.3d 236, 248 (5th Cir. 2017) (applying plain-error review to a claim that the district court violated the Ex Post Facto Clause by applying the wrong version of the Guidelines Manual); *United States v. Murray*, 648 F.3d 251, 253 (5th Cir. 2011) (same).

[59] *See United States v. Booker*, 543 U.S. 220, 245 (2005).

[60] 569 U.S. 530, 533 (2013).

[61] *See Kiekow*, 872 F.3d at 249; *United States v. Myers*, 772 F.3d 213, 219 (5th Cir. 2014).

higher sentence,"[62] the error affected James's substantial rights and warrants correction, as it "offends the fairness, integrity, or public reputation of judicial proceedings."[63] We therefore agree with the parties that James is entitled to resentencing.

## III. Conclusion

The evidence was more than sufficient for a rational jury to find that James intended to kill M.M. The jury instructions were imperfect, but any defect was invited by James's own proposed language and did not produce a manifest injustice. We therefore AFFIRM the conviction.

The sentence is different. The district court used a later Guidelines Manual that produced a higher sentencing range than the Manual in effect when the offense occurred. That was plain error under *Peugh*. We therefore VACATE James's sentence and REMAND for resentencing under the proper Guidelines Manual.

---

[62] *Kiekow*, 872 F.3d at 249 (quoting *Myers*, 772 F.3d at 219).

[63] *Myers*, 772 F.3d at 219.